The MARKET FORCE, INC., d/b/a Home Buyer R.E. Search, Plaintiff,

v.

WAUWATOSA REALTY COMPANY; Coldwell Banker Bruce, Barry & Gleysteen, Inc.; Grace Ciesielski d/b/a Raven Realty; Four Seasons Realty, Inc.; Century 21 Properties Ltd.; and Exclusive Homes, Defendants.

Civ.A. No. 88–C–167.

United States District Court, E.D. Wisconsin.

Feb. 27, 1989.

Edwin Hughes, Stafford, Rosenbaum, Riemer & Hansen, Madison, Wis., for plaintiff.

Mr. Kenneth Nowakowski, Whyte & Hirschboeck, S.C., Milwaukee, Warren Bloomfield (Pro Se), Cudahy, Mr. Warren Blumenthal, Blumenthal, Jacquart, Wilke & Blumenthal, Milwaukee, Walter Schmidt, Schmidt & Rupke, Milwaukee, Mr. David Meany, Michael, Best & Friedrich, Milwaukee, Ms. Mary Palmisano (Pro Se), Brookfield, for defendants.

### DECISION and ORDER

TERENCE T. EVANS, District Judge.

This is the third[1] and final decision in this case. The Market Force, a now-defunct firm that helped home buyers find and purchase property, sued several Milwaukee-area real estate companies under the antitrust laws for allegedly conspiring to hold down the commissions paid to Market Force agents. In a decision on August 4, 1988, I determined that Market Force was not obligated to have its antitrust claim arbitrated by the Milwaukee Board of Realtors, of which Market Force was a member. In a decision released on September 26, 1988, I denied Market Force's request for a preliminary injunction that would have compelled the defendants to pay Market Force agents the same commissions that are usually paid to traditional selling brokers. I held that Market Force would have an adequate remedy at law—in money damages—if it were to prevail in the end.

Now the defendants have moved for summary judgment,[2] arguing that no jury could reasonably characterize their conduct as a violation of section 1 of the Sherman Act, 15 U.S.C. § 1, as alleged in the complaint. I agree. Therefore, I grant summary judgment in favor of the defendants. My reasons, and the facts behind them, follow.

### FACTS

In a typical home sale, the seller contracts with a real estate "listing broker" (or "listing agent"), who advertises the availability of the property, usually by listing it with a Multiple Listing Service (MLS). The MLS functions as an information exchange for its members. Firms that join and pay monthly dues may submit information about their clients' properties at a charge of ten dollars per listing. By listing a property with an MLS, a listing broker makes a blanket offer of subagency to all other MLS members who want to try to procure a buyer for the property. If a participant accepts the offer and shows or describes the property to potential buyers, this "selling broker" (or "selling agent") owes a fiduciary duty to the listing broker and the seller. In other words, this subagent works *with* but not *for* possible buyers. *See generally* National Association of Realtors, *Who Is My Client? A Realtors Guide to Compliance with the Law of Agency* 4–8 (1986).

Under the MLS arrangement, listing brokers who find buyers function as selling agents for other listing brokers, while selling agents who list property act as listing brokers for other selling agents. Thus, the system seems to function on sort of a cooperative competition basis. As the system operates, the listing firm shares its own commission—which is usually 6% of the selling price—with the subagent who successfully matches a buyer with the seller. The MLS listing advises how much of the commission the listing broker will pay out. According to the head of the Milwaukee area MLS, "If an individual broker desires to offer anything other than that which they indicate in the Multiple Listing Service, they should notify the [selling] broker preferably in writing." A listing broker cannot arbitrarily refuse to let an MLS member show an available property to potential buyers.

The defendants and Market Force were all members of Milwaukee's MLS during the relevant period. Market Force's agents, and the defendants', were also licensed by Wisconsin's real estate regulators. Market Force, however, did not contribute property listings to the MLS system. Instead, Market Force employees attempted to serve as agents of potential buyers. Although its personnel performed the same kinds of tasks as selling agents—that is, showing property to would-be buyers and helping them prepare purchase offers—Market Force would enter into contracts with buyers and assume an exclusive

---

1. Actually, there have been four decisions, but one was so short that I won't count it.

2. All of them so moved except Bloomfield Realty, Inc., which recently filed for protection under the bankruptcy code. Market Force has agreed to dismiss Bloomfield without prejudice. Earlier in this litigation, Stefaniak Realty was dismissed by stipulation.

duty of loyalty to them, rather than to sellers and their listing brokers.

Nothing in the law, the Realtors' guidelines, or the MLS rules prohibits licensed individuals from serving as "buyers' agents" (or "buyers' brokers") in real estate deals. In fact, the Realtors' booklet cited above states:

> Of course, MLS participants can, if they choose, reject the offers of subagency being made through the MLS and instead represent the buyer. If MLS participants do choose to represent the buyer, they must inform the listing broker that they are agents of the buyer before they attempt to show the listed property.

*Id.* (emphasis omitted). Market Force informed listing brokers and sellers that its employees were representing buyers.

Buyers' agents are relative newcomers to the real estate industry in Milwaukee and elsewhere. (Market Force opened its doors in 1986.) Given where their loyalties lie, they can arguably do a better job for home buyers than selling agents can. By way of example, a selling agent has a duty to inform the seller if the buyer is willing or able to pay more than the original bid— something that many buyers tell selling agents on the assumption that it will be held in confidence.[3] Conversely, though, the advent of buyers' agents could mean that sellers receive lower prices from buyers who had the benefit of independent assistance. Because buyers and sellers may not understand who their agents really are, more than a dozen states, including Wisconsin, require all real estate agents to disclose whom they represent. *See* Wis. Adm.Code § RL 24.07(4) (July 1988). Thus, a listing broker or selling agent must inform a prospective buyer in writing that he or she represents the seller's interests; a buyers' agent must inform a prospective seller in writing that he or she represents the buyer's interests. *Id.*

The issue of compensation is more complicated than agency. The defendants and Market Force cannot even agree on whether the buyer or the seller actually pays the listing broker's commission. In a sense, it is a metaphysical question. Everyone agrees that the listing broker receives 6% of the home's selling price in the usual transaction. The defendants say this money comes out of the seller's pocket. Boilerplate closing documents show that the commission is charged to the seller, and the standard listing contract between a seller and a listing broker indicates that the seller is responsible for paying it. However, Market Force maintains that the 6% commission is built into the price of the home, so it is the buyer who foots the bill. At the very least, says Market Force, the commission is equally borne by the buyer and seller.

Market Force and the defendants do agree on how listing brokers typically share commissions with selling agents. In a mine-run deal, the listing broker keeps 60% of the 6% commission and gives the other 40% to the selling agent. Put another way, the listing broker ends up with 3.6% of the sale price, while the selling broker nets 2.4% of the total price. This 60/40 split is called the "co-broke commission."

Market Force's clients contracted to pay it a fee of 40% of the sales commission or 2.4% of the selling price, whichever was greater. (Customers who did not close on houses paid nothing, except certain fees in limited circumstances.) But in the words of the firm's president, Roy Lemke, "Market Force would likely be pricing its services out of the market if its clients were required to pay a 2.4% commission to the company on top of the 6% commission that is already built into the sales price." Hence, Market Force preferred to be compensated for its services by receiving a co-broke commission from listing brokers. Market Force's contract with buyers—the "Agency Disclosure and Compensation

---

**3.** According to a study that Market Force cites, 72% of home buyers surveyed believed that selling agents were their own agents; 73% told these agents the highest amount they would be willing to pay, and 83% thought such information would remain confidential. FTC Los Angeles Regional Office, *The Residential Real Estate Brokerage Industry* 70, 78 (1983).

Agreement"—stated that purchase offers prepared by Market Force would request the seller to ask the listing broker to share the co-broke commission with the buyers' agent. If the seller and listing broker agreed to pay the co-broke to Market Force, the buyer's own obligation to Market Force would be extinguished. The parties' informed consent would avoid problems of dual agency.

Some listing brokers cooperated with Market Force and paid it the co-broke as requested. On the other hand, one broker decided to pay Market Force nothing, others announced they would pay Market Force a "referral fee" of 0.6% of the sales price, while still others determined that Market Force should receive 1.2% of the sales price. The sequence of events, as reconstructed from exhibits and deposition excerpts supplied by Market Force and the defendants, went like this:

In June 1987, a buyer represented by Market Force submitted an offer on a home listed by Mayfair Homes (which is not a defendant). Mayfair provided a co-broke commission to Market Force, but Mayfair's president, Randy Krysinski, developed a "concern" about buyers' agents.[4] Consequently, he adopted a policy that Mayfair would not share any part of its commission with buyers' agents. A copy of the policy, dated September 9, 1987, is attached to this opinion. Mr. Krysinski checked with the head of the MLS to see if the policy would cause problems there—the answer was "no"—and he distributed the document to Mayfair employees as well as to individuals who wanted to act as buyers' agents in transactions with Mayfair.

In the fall of 1987, Joann Glawe, the general sales manager of defendant Wauwatosa Realty, was also concerned about Market Force. She thought it was "unethical" for buyers' agents to have sellers ask listing brokers to share their commissions with the buyers' agents. Ms. Glawe had

an employee check out Market Force by pretending to be a potential Market Force customer. On another occasion, two Wauwatosa agents attended a Market Force buying seminar without identifying themselves. Ms. Glawe also protested to the head of the MLS, Peter Shuttleworth, that Market Force's advertisements were improper and that Market Force was getting a free ride with MLS because it did not contribute listings or pay $10 for each one.[5] Mr. Shuttleworth told her that Mayfair had a policy regarding commission splits with buyers' agents.

Ms. Glawe then called Mr. Krysinski, whom she knows, and asked him what Mayfair's policy was. He gave her a summary of the policy over the phone but did not send her a copy. Both deny in affidavits that they discussed whether Wauwatosa would or should adopt a similar policy.

Either before or after her conversation with Mr. Krysinski—it is not clear from the record—Ms. Glawe drafted a policy for Wauwatosa, a copy of which is attached to this opinion. Dated October 23, 1987, it provides a "referral fee" to buyers' agents of "20% of the sales side of each transaction at the time of closing." A "sales side" is one half of the 6% overall commission; the "listing side" is the other half. Thus, a buyers' agent receives 0.6% of the selling price instead of the 2.4% co-broke commission given to a selling agent. Buyers' agents get these referral fees if they show the property, prepare purchase offers, arrange financing, and handle communications between the buyer and the seller's agent—tasks usually performed by selling agents.

According to her affidavit, Ms. Glawe wrote the Wauwatosa policy with specific business reasons in mind: (1) Wauwatosa was paying the same 20% referral fee to out-of-state and non-MLS brokers who referred buyers to Wauwatosa; (2) Wauwato-

---

4. His concern was that listing brokers and sellers are exposed to "additional liability" when buyers' agents, as opposed to selling agents, assist buyers. In retrospect, this concern seems unfounded because neither sellers nor listing brokers are likely to be held responsible for the activities or representations of buyers' agents, at least not where all agents disclose the identity of their principals.

5. Wauwatosa Realty placed more than 4,700 listings into the MLS computer in 1987.

sa might have to pay a selling agent in a transaction even though a buyers' agent was involved, where, for example, a selling agent held an open house and the buyer represented by a buyers' agent toured the home; (3) Wauwatosa pays its listing agents more when a buyers' agent but not a selling agent is involved, on the theory that the listing agent must take on some of the duties of a selling agent, such as answering questions on behalf of the seller; and (4) buyers' agents have lower costs than selling agents because they do not list homes in the MLS.

Ms. Glawe asked Mr. Shuttleworth at MLS about disseminating Wauwatosa's policy. In her second deposition, she recalled that he told her that "other brokers other than just buyer brokers were doing this and it might be well to let everybody know." In his deposition, Mr. Shuttleworth remembered telling her that MLS rules require listing brokers to notify members if an advertised subagency commission will be departed from. Subsequently, Ms. Glawe had the Wauwatosa policy mailed to all 250 or so members of the MLS. In her first deposition, she testified that she did not discuss her policy with anyone else in the real estate industry (except for Mr. Shuttleworth) before sending it out. After sending it out, she fielded phone calls from small selling agents who were concerned that Wauwatosa had changed its co-broke policy. She told them the referral policy did not alter their co-broke commission. One broker, defendant Grace Ciesielski, a sole proprietor doing business as Raven Realty, spoke with Ms. Glawe and says in an affidavit that Ms. Glawe did not try to influence her to adopt any position on the matter of commission-splitting.

Wauwatosa's policy was received by defendant Coldwell Banker Bruce Barry & Gleysteen. James Bruce, who runs the Milwaukee office of Coldwell, had heard of and read about buyers' agents, and he decided to draft and send out a policy similar to Wauwatosa's. Mr. Bruce testified at his deposition and in an affidavit that he did not communicate with anyone outside Coldwell Banker before he rewrote Wauwato-

sa's policy. The only substantive change he made to Wauwatosa's document was to change the referral fee from 20% of the sales side to 20% of the total commission received or 1.2% of the sales price, whichever is less. He said this change was intentional, although there is some evidence that Mr. Bruce misinterpreted the ambiguity in Wauwatosa's language. In any event, the Coldwell policy ended up providing buyers' agents with double the compensation of the Wauwatosa plan.

A copy of Coldwell's policy, which became effective on November 11, 1987, is attached to this opinion. In an affidavit, Mr. Bruce says he arrived at the 1.2% fee by weighing the value to sellers of referrals from buyers' agents against the fact that these agents advance the interests of buyers, possibly at the expense of sellers. Also, Mr. Bruce believed that buyers should compensate their own agents. He "decided that a buyer's broker is not worth the same [to a seller] as a broker working for the seller, but that they are worth a referral fee." He adds that "I simply saw what I thought was a good idea and decided to make part of it our policy, too." Mr. Bruce sent copies of Coldwell's policy to all MLS members.

Another real estate firm that received Wauwatosa's policy was Equitable/Stefaniak Realty, a former defendant. Its president, George Stefaniak, had previously complained about Market Force's advertisements to the producers of a local real estate television show. On December 1, 1987, the issue of buyers' agents was discussed at a Stefaniak managers meeting, according to the deposition testimony of John Gemeinhardt, the general manager of residential sales. At least one manager and Mr. Gemeinhardt were "very concerned on what was happening" with buyers' agents, and the group decided "it's time to get out a policy [on commissions] in writing." Mr. Gemeinhardt said he never spoke to anyone outside Stefaniak about buyers' agents before he saw Wauwatosa's policy, and he did not talk to Joann Glawe after receiving the document.

Those attending the managers meeting discussed "coming up with a policy in writing stating our policy based on what the Multiple Listing Service says, if you change any one of your commission policies or if you change your policy, you must notify the other brokers in writing," Mr. Gemeinhardt recalled. Though Stefaniak had never before mailed to the MLS membership—because "we haven't changed any type of a policy"—the firm sent out copies of its referral policy. The policy, a copy of which is attached to this opinion, became effective on December 15, 1987. Like Wauwatosa Realty's plan, it provides buyers' agents with a referral feel of "20% of the sales side of each transaction" upon closing.

On December 16, 1987, Bloomfield Realty, a former defendant, issued a referral policy that corresponded to Coldwell's, providing "1.2% of the sales price or 20% of the total commission received, whichever is less...." A copy of the Bloomfield policy is attached to this opinion. The president of Bloomfield, Warren Bloomfield, testified at his deposition that the Wauwatosa policy

> made me think about the situation. We hadn't really had any contact with them that I know of, of the buyers' brokers....
>
> ....
>
> ... However, I don't necessarily follow a policy that Wauwatosa would send out. It just seemed the right thing to do at the time.

Mr. Bloomfield also testified that he sent copies of his company's policy to all MLS members—because he thought MLS rules required him to do so—but that he did not discuss buyers' agents with anyone else in the real estate industry before or after mailing out the statement.

Bloomfield Realty's policy was received by Andrew Dean, the president of Realty World–Dean Realty (which is not a defendant). At the time, Dean Realty had not had any dealings with buyers' agents, and Mr. Dean was not familiar with them. Nevertheless, Mr. Dean adopted a policy like Bloomfield's on December 24, 1987. A copy of the policy is attached to this opinion. Mr. Dean testified at his deposition that he wrote a policy

> [b]ecause I wanted to be up with the rest of the brokers in the community.
>
> ....
>
> ... They apparently had done some research on it and said we're not going to do this [pay the co-broke] anymore. Therefore I want to be one of the brokers in the area doing what everybody else is doing.

Mr. Dean also testified that he never spoke to anyone in the business about buyers' agents. He mailed copies of the Dean policy to companies that had sent him theirs.

A few weeks later, Century 21 Cambridge, Inc. (which is not a defendant), adopted a referral policy, effective January 15, 1988. The policy followed the fee structure set by Wauwatosa; a copy is attached to this opinion. David Hedrich, the president of Century 21 Cambridge, testified at his deposition that he did not talk about buyers' agents with anyone from Wauwatosa Realty, Coldwell Banker, or Raven Realty.[6] Mr. Hedrich answered "yes" when he was asked if he had adopted the policy to ensure reciprocity with firms that paid referral fees themselves, but which might approach Cambridge as buyers' agents.

There are many other facts involved in this dispute, but they are of lesser significance to my decision. Defendants Raven Realty and Four Seasons Realty probably hampered efforts to have sellers in two transactions direct a full co-broke commission to Market Force. Two other defendants, Century 21–Exclusive Homes and Century 21 Properties, Ltd., probably told Market Force that they would pay referral fees instead of commissions, though officials from these companies deny talking to other real estate brokers about buyers' agents before the initiation of Market Force's lawsuit.

6. His testimony might have mentioned other companies, but I cannot tell from the limited portions of the transcript that were provided to me.

MLS data show the percentage of all listings that each listing broker contributed in 1987. For some [7] of the firms implicated in this case, the figures are as follows:

| | |
|---|---|
| Bloomfield Realty | 0.53% |
| Century 21 Properties | 0.68% |
| Coldwell Banker | 8.73% |
| Exclusive Homes | 0.52% |
| Four Seasons Realty | 0.10% |
| Mayfair Homes | 0.32% |
| Raven Realty | 0.04% |
| Stefaniak Realty | 2.67% |
| Wauwatosa Realty | 18.65% |
| Total | 32.24% |

Except for Wauwatosa, no MLS member enters more than 10% of all listings in the information exchange.

After Market Force filed suit, most but not all of the companies that had adopted referral policies stopped enforcing them. As of November 22, 1988, the Market Force was out of business. Its owner, Roy Lemke, says his agents left the enterprise because of the hostility shown to Market Force by many in the real estate industry. In the months before it closed, Market Force decided not to seek from clients the difference between referral fees and the amount that Market Force customers had agreed to pay it, which was equal to a co-broke commission.

## DISCUSSION

Market Force has sued under section 4 of the Clayton Act, 15 U.S.C. § 15, on account of an alleged conspiracy in restraint of trade. The Clayton Act permits private parties to seek redress for violations of the antitrust laws, and Market Force alleges a violation of section 1 of the Sherman Act. Section 1 of the Sherman Act provides:

> Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is hereby declared to be illegal.

15 U.S.C. § 1.

To prevail at trial, Market Force would have to prove that the defendants conspired to pay it the smaller referral fees instead of co-broke commissions. The jury would have to find that the defendants "had a unity of purpose or a common design and understanding, or a meeting of minds in an unlawful arrangement...." *American Tobacco Co. v. United States,* 328 U.S. 781, 810, 66 S.Ct. 1125, 1139, 90 L.Ed. 1575 (1946). "Independent action is not proscribed." *Monsanto Co. v. Spray-Rite Service Corp.,* 465 U.S. 752, 761, 104 S.Ct. 1464, 1469, 79 L.Ed.2d 775 (1984).

> [S]ection one of the Sherman Act does not prohibit independent business decisions and actions. A real estate agency generally has a right to refuse to co-broke with a competing agency for reasons sufficient to itself, including because it thinks the other agency is acting unfairly in trying to undermine its trade, provided its refusal stems from independent decision and not from some agreement, tacit or expressed.

*Orval Sheppard Real Estate Co. v. Valinda Freed & Associates, Inc.,* 608 F.Supp. 354, 357 (M.D.Ala.1985) (citing *Spray-Rite,* 465 U.S. at 761, 104 S.Ct. at 1469, and *Theatre Enterprises v. Paramount Film Distributing Corp.,* 346 U.S. 537, 541, 74 S.Ct. 257, 259-60, 98 L.Ed. 273 (1954)).

■ As Market Force acknowledges, "conscious parallelism" in the defendants' behavior is not sufficient, standing alone, to establish a conspiracy. *See* VI P. Areeda, *Antitrust Law* para. 1410 (1986) ("courts are unanimous in saying that mere interdependent parallelism is not a Sherman Act § 1 agreement"). Instead, proof of a conspiracy requires parallel behavior plus additional facts or circumstances that raise the inference of agreement. *See, e.g., Modern Home Institute, Inc. v. Hartford Accident and Indemnity Co.,* 513 F.2d 102, 110 (2d Cir.1975). Such "plus factors" include activity that is contrary to economic self-interest or common action that occurs in a setting which bespeaks accord. *Orval Sheppard,* 608 F.Supp at 358; *Park v. El Paso Board of Realtors,* 764 F.2d 1053,

---

**7.** Counsel did not provide data for Century 21 Cambridge or Dean Realty. It appears from the MLS computer sheet that Cambridge placed 0.38% of all listings, but I cannot decipher a number for Dean Realty.

1060 n. 11 (5th Cir.1985). In the *Park* case, the court stated:

> Although, as part of a larger case, evidence of consciously parallel business behavior is circumstantial evidence from which a conspiracy can be inferred, standing alone it "has no significant probative force where the defendants can fully explain how independent business judgment would have led to such a refusal [to deal]." Unless an antitrust plaintiff offers "evidence that tends to exclude the possibility that the [defendants] were acting independently," an inference of conspiracy is unreasonable.

764 F.2d at 1060 (citations omitted).

To defeat the defendants' motions for summary judgment, Market Force must neutralize evidence that the defendants adopted their policies for independent business reasons without a conspiracy being afoot. The Court of Appeals for the Seventh Circuit explained the plaintiff's burden in *Weit v. Continental Illinois National Bank & Trust Co. of Chicago*, 641 F.2d 457 (7th Cir.1981), *cert. denied*, 455 U.S. 988, 102 S.Ct. 1610, 71 L.Ed.2d 847 (1982):

> [W]hen defendants come forward with denials sufficient to shift the burden under Rule 56(e), plaintiffs must come forward with some significant probative evidence which suggests that conscious parallelism is the result of an unlawful agreement. Parallel behavior and the hope that something further can be developed at trial is not sufficient to warrant a trial on the merits....
>
> ....
>
> ... [W]hen the plaintiff or prosecution relies on circumstantial evidence alone, the inference of unlawful agreement rather than individual business judgment must be the compelling, if not exclusive, rational inference.

641 F.2d at 462–63 (citations omitted). *See also Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 588, 106 S.Ct. 1348, 1357, 89 L.Ed.2d 538 (1986), where the Supreme Court said: "To

survive a motion for summary judgment or for a directed verdict, a plaintiff seeking damages for a violation of § 1 must present evidence 'that tends to exclude the possibility' that the alleged conspirators acted independently." (quoting *Spray–Rite*, 465 U.S. at 764, 104 S.Ct. at 1471).

■ Here, Market Force relies exclusively on circumstantial evidence. There is no direct proof of an agreement among the defendants. All but three of the individuals who promulgated referral policies for their companies swear that they did not discuss the issue with competitors before drafting the plans. Although Ms. Glawe spoke with Ms. Ciesielski and Mr. Krysinski, they all deny having discussed the merits of referral fees. And the fact that some firms mailed out their policies is at least as consistent with an innocuous explanation—that they were following MLS rules—as it is with a conspiracy.

There is not even evidence of wholly parallel behavior on the part of the putative conspirators. The Mayfair firm, after all, began offering buyers' agents *nothing*, while some listing brokers offered to share 0.6% of the selling price. A third group decided to pay twice as much, or 1.2% of the selling price.

Moreover, key defendants have come forward with independent business reasons for adopting referral fee policies. Ms. Glawe of Wauwatosa and Mr. Bruce of Coldwell Banker, in particular, cited specific justifications that they considered when devising their referral fees. Market Force has found flaws in the proffered rationales, but it could not point to any proof that Ms. Glawe and Mr. Bruce did *not* reason as they say they did. Their stated purposes, though arguably unwise from Market Force's perspective, are not economically irrational. If nothing else, the listing brokers' clients, the sellers, get more loyalty from selling agents than from buyers' agents, and so the listing brokers rationally may choose to pay selling agents more than buyers' agents.[8]

---

**8.** In this regard, it is worth noting that some home buyers employ lawyers or property inspectors to help them make their purchases.

To be sure, a few of the listing brokers admit to having adopted referral fee policies merely because others had done so. But "doing what everybody else is doing," as Mr. Dean put it, is not illegal in the absence of a tacit or explicit agreement. The record shows that small firms followed the example, but not the instructions, of two industry leaders, Wauwatosa and Coldwell. The smaller firms displayed independent business judgment insofar as they believed that Wauwatosa and Coldwell had grappled with a new situation. Buyers' agents were, in fact, new players on the scene.

I agree with Market Force that the defendants had an economic incentive to drive Market Force off the scene. The growth of buyers' agents could reduce demand for selling agents, a job that is either the principal or secondary role of the defendants. At the same time, however, I disagree with Market Force's assertion that no defendant would have adopted a referral fee policy unless it expected others to follow suit. According to Market Force's theory, a listing broker who pays referral fees instead of co-broke commissions thereby raises the cost of the firm's listings to those buyers represented by buyers' agents, since such buyers would be obligated to pay their agents something. As a result, the argument goes, sellers will list with those brokers who do not establish barriers to sales to buyers represented by buyers' agents—unless, of course, *all* brokers erect the same barrier. *See The Brokers' Assistant, Inc. v. Williams Real Estate Co.*, 646 F.Supp. 1110, 1122 (S.D.N.Y.1986) ("getting all the defendants to join in the boycott was essential for any one defendant to succeed in suffocating [plaintiff]").

The proof is in the pudding, though. The number of firms that ended up issuing referral policies is relatively insignificant when compared to the number of MLS members. As a group, the "referralists"

The buyers in such instances pay these agents

list no more than a third of all properties in the MLS computer. In addition, if Market Force's theory were correct, then the companies that enforced their policies until the bitter end (of Market Force) were committing economic suicide. The inference from this is that there was no conspiracy. Moreover, Market Force's theory assumes that buyers represented by buyers' agents constitute a significant market for sellers and their listing brokers. Such was not the case, in Milwaukee at least, when the defendants adopted their referral policies.

Market Force sees a "plus factor" in the hostility that some defendants displayed. This hostility, says Market Force, suggests a setting that bespeaks accord among the defendants. *See Penne v. Greater Minneapolis Area Board of Realtors*, 604 F.2d 1143, 1148–49 (8th Cir.1979) (summary judgment inappropriate where there was evidence that defendant brokers disparaged plaintiff to customers and refused to show plaintiff's property listings because he charged lower commission). Though some defendants did in fact show hostility to Market Force—for example, by complaining to the head of the MLS—I do not think the evidence rises to the level of excluding the possibility that the defendants acted independently. Simply stated, coincidence does not a conspiracy make. And even drawing the inferences in favor of Market Force, a conspiracy is not the "compelling, if not exclusive, rational inference" from the record. *Weit*, 641 F.2d at 463.

Finally, I am aware of the warning that "[c]onclusional denials of conspiracy in affidavits obviously drafted by lawyers are entitled to little weight in deciding whether to grant an antitrust defendant's motion for summary judgment." *Products Liability Insurance Agency, Inc. v. Crum & Forster Insurance Companies*, 682 F.2d

directly.

660, 662 (7th Cir.1982). But in this case, important testimony comes from depositions and affidavits. There is not enough, or really any, evidence here that should allow this suit to live longer than it already has.

For the foregoing reasons, the defendants' motions for summary judgment are GRANTED, and the complaint is DISMISSED.

SO ORDERED.

APPENDIX

EXHIBIT A

UNLIMITED INC.
11803 West North Ave., Wauwatosa, Wisconsin 53226
414-257-1166

September 9, 1987

**EXHIBIT**
Krysinski #2
11-8-88 AB

POLICY STATEMENT
Brokers/Agents acting as agents of buyers

1. Agents of Mayfair Homes Unlimited Inc. shall be permitted to act as an agent for a buyer only under the authority of a properly executed form designated by the Wisconsin Department of Regulation and Licensing, WB-36 Exclusive Buyer Agency Contract.

2. Licensed real estate brokers and their sales associates acting as agents of buyers under the authority of a properly executed agency agreement with the buyer, shall be required to disclose to Mayfair Homes Unlimited Inc., at the first inquiry or discussion relative to a specific property or on behalf of a specific buyer for which said agent has an agency relationship, that said agent has said agency relationship with the buyer.

3. Licensed real estate brokers and their sales associates acting as agents of buyers shall be permitted to demonstrate any and all properties listed with Mayfair Homes Unlimited Inc., with the exception of those listings where a buyer's agent is specifically excluded from showing a property at the direction of the seller.

4. Licensed real estate brokers and their sales associates acting as agents of buyers, wishing to demonstrate a Mayfair Homes Unlimited Inc. listing shall be accompanied by the listing agent or designate when showing the subject property. Said listing agent or designate, clearly aware of the agency relationship to the seller, shall demonstrate or assist in demonstrating said listing, if appropriate, and in all aspects, represent the best interests of the seller.

5. Licensed real estate brokers and their sales associates acting as agents of buyers, shall not be entitled to any portion of the commission paid to Mayfair Homes Unlimited Inc., from seller under the terms of a properly executed exclusive listing agreement between Mayfair Homes Unlimited Inc., and the seller of the subject property.

This policy statement is effective as of the date as stated above, and may be recinded, modified, expanded or otherwise changed by the management of Mayfair Homes Unlimited Inc., at any time as deemed necessary.

Receipt of a copy of this policy is hereby acknowledged.

Date _____   _____
                                        (Broker/Sales Associate acting as
                                        buyer's agent)

Wisconsin's Finest Home Seller
Selling Wisconsin's Finest Homes

1398

Executive Office
11622 West North Avenue
Milwaukee, Wisconsin 53226
(414) 476-1900
Realtor - MLS - Equal Housing Opportunity

WAUWATOSA
Realty Company
Wisconsin's largest home seller

## WAUWATOSA REALTY COMPANY

### REFERRAL POLICY STATEMENT

Please be advised that effective October 26, 1987, Wauwatosa Realty Company shall institute a referral policy for BUYER'S BROKER, said referral fee being 20% of the sales side of each transaction at the time of closing.

° The agent, acting as a BUYER'S BROKER, shall accompany their customer on all showings and inspections of Wauwatosa Realty Company listed properties, and shall prepare the Offer to Purchase.

• The agent, acting as a BUYER'S BROKER, will be responsible for assisting their customer in all arrangments for financing.

• The agent, acting as a BUYER'S BROKER, will be responsible for all communications between BUYER and SELLER'S agent.

There shall be an addendum to any Purchase and Sales Agreement that shall disclose to the SELLER that the agent, acting as a BUYER'S BROKER represents the BUYER and is not a sub-agent of the SELLER.

There will not be a sub-agency fee split with BUYER'S BROKER effective as of this date.

WAUWATOSA REALTY COMPANY

October 23, 1987                    BY: _____

Joann D. Glawe
Vice President/General Sales Manager

Clause to be inserted in every Wauwatosa Realty Company Listing Contract, beginning October 21, 1987:

"SELLER IS AWARE THAT IN LIEU OF A CO-BROKE AGREEMENT, WAUWATOSA REALTY COMPANY WILL PAY 20% OF THE SELLING PORTION OF ANY COMMISSION TO ANY BROKER WHO REPRESENTS THE BUYER AS HIS PRINCIPAL."

**1400**

EXHIBIT C

A MEMBER OF THE SEARS FINANCIAL NETWORK

**COLDWELL BANKER**

COLDWELL BANKER
BRUCE, BARRY & GLEYSTEEN
4491 N. OAKLAND AVE PO BOX 11934
MILWAUKEE. WI 53211-1687
(414) 962-4413

### REFFERAL POLICY STATEMENT

Please be advised that effective November 11, 1987, COLDWELL BANKER shall institute a referral policy for Buyer's Broker, said referral fee being 1.2% of the sales price or 20% of the total commission received, whichever is less, of each transaction at the time of closing.

* The agent, acting as a Buyer's Broker, shall accompany their customer on all showings and inspections of COLDWELL BANKER listed properties, and shall prepare the Offer to Purchase.

* The agent, acting as a Buyer's Broker, will be responsible for assisting their customer in all arrangements for financing.

* The agent, acting as a Buyer's Broker, will be responsible for all communications between Buyer and Seller's agent.

There shall be an addendum to any Purchase and Sales Agreement that shall disclose to the Seller that the agent, acting as a Buyer's Broker represents the Buyer and is not a sub-agent of the Seller.

There will not be a sub-agency fee split with Buyer's Broker effective as of this date.

COLDWELL BANKER
Residential Real Estate Services

James F. Bruce, GRI, CRS, CRB
Senior Vice President

EXHIBIT D

# EQUITABLE/STEFANIAK REALTY

EQUITABLE/STEFANIAK REALTY
REFERRAL POLICY STATEMENT

Please be advised that effective December 15, 1987 Equitable/Stefaniak
Realty is instituting a referral policy for the Buyer's Broker wherein
a referral fee of 20% of the sales side of each transaction will be paid
to the Buyer's Broker at the completion of the closing.

REQUIREMENTS:

a) The agent, acting as Buyer's Broker, must accompany the prospective
Buyer on all showings and inspections of Equitable/Stefaniak
listed properties and must draft the Offer to Purchase.

b) The agent, acting as Buyer's Broker, will assist the prospective
Buyer in obtaining financing, if required, and obtain a copy
of the Buyer's financial qualifications to be delivered to
Equitable/Stefaniak for Seller's review prior to acceptance of
the Offer to Purchase.

c) The agent, acting as a Buyer's Broker, will act as a conduit
of all communications between Buyer and Seller's agent.

The offer to Purchase must contain the following statement:  THE BROKER
DRAFTING THIS OFFER IS THE AGENT OF THE BUYER.  The Buyer's Broker represents
the Buyer and is not a sub-agent of the Seller.  Accordingly, there will
not be a sub-agency fee split with the Buyer's Broker effective as of
this date.

John C. Gemeinhardt
General Manager
Residential Sales

**REALTY WORLD® — Bloomfield Realty, Inc.**
1233 N. Mayfair Road, Suite 119, Wauwatosa, WI 53226
Telephone: (414) 258-1050

## REFFERAL POLICY STATEMENT

*Please be advised that effective December 16, 1987, REALTY WORLD Bloomfield Realty, Inc. shall institute a referral policy for Buyer's Broker, said referral fee being 1.2% of the sales price or 20% of the total commission received, whichever is less, of each transaction at the time of closing.*

> *\*The agent, acting as a Buyer's Broker, will be responsible for all communications between Buyer and Seller's agent.*

> *\*The agent, acting as a Buyer's Broker, shall accompany their customer on all showings and inspections of Bloomfield Realty listed properties, and shall prepare the Offer to Purchase.*

> *\*The agent, acting as a Buyer's Broker, will be responsible for assisting their customer in all arrangements for financing.*

*There shall be an addendum to any Purchase and Sales Agreement that shall disclose to the Seller that the agent, acting as a Buyer's Broker represents the Buyer and is not a sub-agent of the Seller.*

*There will not be a sub-agent fee split with Buyer's Broker effective as of this date.*

*REALTY WORLD-Bloomfield Realty, Inc.*

*Warren Bloomfield, President*

EXHIBIT F

Dean # 1
11-9-88 RB

REALTY WORLD® — Dean Realty, Inc.
8726 W. North Avenue, Wauwatosa, WI 53226
Telephone: (414) 778-5188

## REFERRAL POLICY STATEMENT

Please be advised that effective December 24th, 1987, REALTY
WORLD-Dean Realty, Inc, shall constitute a referral policy for
Buyer's Broker, said referral fee being 1.2% of the sales price
or 20% of the total commission received, whichever is less, of
each transaction at the time of closing.

1. The agent, acting as a Buyer's Broker, shall accompany their
   customer on all showings and inspections of REALTY WORLD-
   Dean Realty, Inc. listed properties, and shall prepare the
   Offer to Purchase.
2. The agent, acting as a Buyer's Broker, will be responsible
   for assisting their customer in all arrangements for financing.
3. The agent, acting as a Buyer's Broker, will be responsible
   for all communications between Buyer and Seller's agent.

There shall be an addendum to any Purchase and Sales Agreement
that shall disclose to the Seller that the agent, acting as a
Buyer's Broker represents the Buyer and is not a sub-agent of
the Seller.

There will be no sub-agency fee split with Buyer's Broker
effective as of this date.

REALTY WORLD-Dean Realty, Inc.

Andrew Dean
President

000224

**THE RESULTS PEOPLE:**
Each office independently owned and operated

1404

EXHIBIT G

**CAMBRIDGE, INC.**
17555 West North Avenue
Brookfield, Wisconsin 53005
(414) 785-1811

## REFERRAL POLICY STATEMENT

Please be advised that effective January 15, 1988 Century 21
Cambridge, Inc. is instituting a referral policy for the
covering  of the Exclusive Buyer's Broker Agency.  A referral
fee of 20% of the sales side of each transaction will be paid
to the Buyer's Broker at the completion of the closing.

REQUIREMENTS:

a)   The agent, acting as Buyer's Broker, must accompany

the prospective Buyer on all showings and inspections

of Century 21 Cambridge, Inc. listed properties and

must draft the Offer to Purchase.

b)   The agent, acting as Buyer's Broker, will assist the

prospective Buyer in obtaining financing, if required,

and obtain a copy of the Buyer's financial qualifications

to be delivered to Century 21 Cambridge, Inc. for

Seller's review prior to acceptance of the Offer to

Purchase.

c)   The agent, acting as a Buyer's Broker, will be responsible

for all communications between Buyer and Seller's agent.

The Offer to Purchase must contain the following statement: THE
BROKER DRAFTING THIS OFFER IS THE AGENT OF THE BUYER.  The Buyer's
Broker represents the Buyer and is not a sub-agent of the Seller.
Therefore, there will not be a sub-agency fee split with the Buyer's
Broker effective as of this date.

David R. Hedrich, President
Century 21 Cambridge, Inc.

*Each Office Is Independently Owned And Operated*

**EXHIBIT**

Hedrich
11-14-w #3