**MARKET FORCE INCORPORATED,
Plaintiff–Appellant,**

v.

**WAUWATOSA REALTY COMPANY,
Coldwell Banker Bruce Barry & Gleysteen, Incorporated, Four Seasons Realty, Incorporated, and Century 21 Properties Limited,[1] Defendants–Appellees.**

No. 89–1674.

United States Court of Appeals,
Seventh Circuit.

Argued Sept. 25, 1989.

Decided July 11, 1990.

---

1. Subsequent to oral argument, an original defendant, Grace Ciesielski (doing business as

Raven Realty), settled with the appellant and is no longer a party to this suit.

Edwin J. Hughes, Stafford, Rosenbaum, Rieser & Hansen, Madison, Wis., for plaintiff-appellant.

Walter F. Schmidt, Kent A. Tess–Matt-
ner, Schmidt & Rupke, Marcia R. Rimai,
Richard J. Sankovitz, Whyte & Hirsch-
boeck, and Warren S. Blumenthal, Blumen-
thal, Jacquart, Blumenthal & Leib, Milwau-
kee, Wis., for defendants-appellees.

Before BAUER, Chief Judge, and
RIPPLE and MANION, Circuit Judges.

RIPPLE, Circuit Judge.

Market Force began operations in 1986
as a real estate buyers' broker. In this
case, it alleged that a group of realtors had
conspired to drive it out of business in
violation of Section 4 of the Clayton Act (15
U.S.C. § 15) and Section 1 of the Sherman
Act (15 U.S.C. § 1).

Market Force's motion for a preliminary
injunction was denied by the district court.
Subsequently, the defendants individually
filed motions for summary judgment. The
district court granted these motions. Mar-
ket Force now appeals the grant of summa-
ry judgment to the defendants. For the
following reasons, we affirm.

# I

## BACKGROUND

### A. *Facts*

#### 1. Market Force and the Real Estate Business

*According to the record, residential real
estate sales generally begin when a home-*
owner signs an exclusive marketing con-
tract with a broker. The broker ("listing
broker") then lists the property on a local
"multiple listing service" (MLS). By list-
ing on the MLS, the broker is making a
general offer of subagency to any salesper-
son who can find a buyer to complete the
sale. Other salespeople can show the
house and try to arrange a sale with a
prospective buyer. These individuals are
called "selling brokers" or "selling agents"
and, while working primarily with the buy-
er, are considered to be agents of the sell-
er. In fact, their duty of loyalty lies with
the seller. While commissions may vary,
the traditional commission is 6% of the cost
of the house, split so that the listing broker
receives 60% (or 3.6% of the cost of the
house) and the selling agent receives 40%
(or 2.4% of the cost of the house).

Market Force began operations in 1986
as a "buyers' broker." It differed from
traditional real estate firms in that it
signed exclusive contracts with individuals
seeking to purchase a house. The Market
Force agent would find houses that the
agent believed might interest clients, and
show the houses to them. Most signifi-
cantly, Market Force agents owed their
duty of loyalty to the buyers. The contract
between Market Force and the buyers spec-
ified that Market Force would receive a fee
equal to 40% of the sales commission, or
2.4% of the selling price. The contract
further anticipated that, at the time of sale,
the buyer would request that the listing
broker pay Market Force this commission.
If the broker cooperated, the buyer would
owe no further obligation to Market Force.

#### 2. The Real Estate Community's Reaction to Market Force

For some time after Market Force began
operation, other real estate firms treated
Market Force in an inconsistent manner
with respect to splitting commissions.
Some firms paid a full 40% commission and
others paid nothing. Mayfair Homes was
the first real estate firm to adopt a con-
crete policy, deciding in September 1987
not to share any part of its sales commis-
sions with Market Force. At the same
time, Wauwatosa Realty Company (Wau-
watosa), a large real estate firm in Milwau-
kee and throughout Wisconsin, occasionally
split commissions and occasionally refused
entirely to enter into sales contracts with
Market Force buyers.

Before formulating a policy about split-
ting commissions with buyers' brokers,
Joann Glawe, Wauwatosa's general sales
manager, contacted Mayfair Homes and in-
quired about its policy. Wauwatosa subse-
quently issued its policy on October 23,
1987. Its policy was to pay a buyers' bro-
ker the same fee it paid to out-of-state or
non-MLS brokers who refer a buyer to
Wauwatosa. The district court noted that:

According to her affidavit, Ms. Glawe wrote the Wauwatosa policy with specific business reasons in mind: (1) Wauwatosa was paying the same 20% referral fee to out-of-state and non-MLS brokers who referred buyers to Wauwatosa; (2) Wauwatosa might have to pay a selling agent in a transaction even though a buyers' agent was involved, where, for example, a selling agent held an open house and the buyer represented by a buyers' agent toured the home; (3) Wauwatosa pays its listing agents more when a buyers' agent but not a selling agent is involved, on the theory that the listing agent must take on some of the duties of a selling agent, such as answering questions on behalf of the seller; and (4) buyers' agents have lower costs than selling agents because they do not list homes in the MLS.

*The Market Force, Inc. v. Wauwatosa Realty Co.*, 706 F.Supp. 1387, 1390–91 (D.Wis. 1989). Wauwatosa mailed a sheet describing its policy to all brokers listed in the MLS book—about 250 firms. Ms. Glawe testified at a deposition that she undertook this mailing following a conversation with Peter Shuttleworth, director of the MLS, who told her that "other brokers other than just buyer brokers were [acting as buyers' brokers] and it might be well to let everyone know." *Id.*

Coldwell Banker, which lists the second highest quantity of homes in Milwaukee after Wauwatosa, issued its policy on November 11, 1987, after reviewing Wauwatosa's policy. It set its commission rate at 20% of the total commission, a figure its chief operating officer may have believed mistakenly was the same as Wauwatosa's.[2] It also mailed its policy to all MLS brokers. In subsequent months, several other firms issued policy statements about sharing commissions with buyers' brokers. The rates were the same as those offered by Wauwatosa or Coldwell—either 10% or 20% of the total sales commission. All the firms that eventually adopted commission policies for buyers' brokers together represented about 31% of the annual listings of homes for sale in the Milwaukee MLS.

Market Force had several negative experiences with other brokers. Several sales were lost due to intransigence about sharing commissions. R.52 at 2; R.54 at 7. One Market Force buyer was told not to work with Market Force and that she would not get the home she was viewing unless she worked with a sales broker instead of Market Force's agent. R.87 Ex. 15 (McGrew Affidavit). At one closing, an agent for Four Seasons Realty told the president of Market Force that "everyone is against you" and that Market Force should quit business. R.54 at 10.

Market Force advertised in local television and print media. In November 1986, as a result of other real estate firms' complaints, the editor of a magazine wanted to remove Market Force's advertisement. The other firms apparently threatened to remove their own advertisements from the magazine if Market Force's advertisement was not removed. R.54 at 5.[3] Several complaints also were made to the executive director of the MLS.

Market Force decided not to enforce its contracts with buyers-clients that would entitle Market Force to collect from them the difference between the amount actually paid as commissions by other brokers and 2.4% of the sale price (the amount guaranteed to Market Force in its contract with its buyers-clients). However, it paid its

**2.** It appears that Coldwell Banker's chief operating officer may have attempted to set its commission to be the same as Wauwatosa's. He testified in a deposition that he thought that Wauwatosa was paying 20% of the total commission, and that he set Coldwell Banker's rate at that level. R.87 Ex. 7 at 32. In fact, Wauwatosa paid 20% of the *selling agent's* commission, which was generally 40% of the total commission.

**3.** Roy Lemke, president of Market Force, stated in an affidavit that a sixty-second segment prepared by him for a local television show was moved to a less desirable position in the show because of complaints to the producer by other real estate brokers. R.54 at 6. The producer of the show denied that he had received any such complaints, and claimed that the decision to move the Market Force segment was "based on a long-standing policy of the show, which had nothing to do with the feelings of any other real estate agencies." R.63 at 2.

agents the fee they would have received if Market Force had received 2.4% of the sale price. Despite the fact that Market Force absorbed this difference, all of its agents eventually left. The company ceased operations in the fall of 1988.

## B. The District Court Opinion

Market Force sued under section 4 of the Clayton Act, which permits parties to seek redress for violations of the antitrust laws. Specifically, Market Force alleged that the defendants violated section 1 of the Sherman Antitrust Act. 15 U.S.C. § 1.[4]

As an initial matter, the district court noted that, in order to find antitrust liability on the part of the defendants, a jury would have to find that the defendants " 'had a unity of purpose or a common design and understanding, or a meeting of minds in an unlawful arrangement.... ' " 706 F.Supp. at 1393 (quoting American Tobacco Co. v. United States, 328 U.S. 781, 810, 66 S.Ct. 1125, 1139, 90 L.Ed. 1575 (1946)). Proof of conspiracy, the district court noted, "requires parallel behavior plus additional facts or circumstances that raise the inference of agreement." Id. Furthermore, to defeat a motion for summary judgment, the court observed, the plaintiff must come forward with evidence that dispels the possibility that the defendants were acting for independent business reasons. Id. at 1394.

Applying these standards, the district court concluded that Market Force had not put forward evidence that would permit a jury to conclude that the defendants had engaged in a conspiracy in restraint of trade. The evidence of any agreement presented was circumstantial. Notably, the action of the defendants was not totally parallel[5] and involved no more than a third of all properties in the MLS computer. The district court determined that the evidence presented by Market Force of several instances of "hostility" failed to exclude the

possibility that the defendants did not conspire. Id. at 1395. Moreover, several defendants had put forward evidence of independent business reasons for adopting a policy regarding buyers' brokers. The district court summarized its reasoning as follows:

> Simply stated, coincidence does not a conspiracy make. And even drawing the inferences in favor of Market Force, a conspiracy is not the "compelling, if not exclusive, rational inference" from the record.

Id. (quoting Weit v. Continental Illinois Nat'l Bank & Trust Co., 641 F.2d 457, 463 (7th Cir.1981), cert. denied, 455 U.S. 988, 102 S.Ct. 1610, 71 L.Ed.2d 847 (1982)).

## II

## ANALYSIS

### A. Standard of Review

Two recent pronouncements of the Supreme Court of the United States establish the applicable rule of decision in this case: Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986), and Monsanto Co. v. Spray-Rite Serv. Corp., 465 U.S. 752, 104 S.Ct. 1464, 79 L.Ed.2d 775 (1984).

Monsanto presented the Court with a question of the sufficiency of proof of a Sherman Act § 1 claim. The Court expressed concern that independent action improperly may be used as evidence of a conspiracy. "On a claim of concerted price fixing, the antitrust plaintiff must present evidence sufficient to carry its burden of proving that there was such an agreement." 465 U.S. at 763, 104 S.Ct. at 1470. The Court then set the evidentiary standard that a plaintiff must meet:

> The correct standard is that there must be evidence that tends to exclude the possibility of independent action by the [defendants]. That is, there must be di-

---

**4.** Section 1 provides in pertinent part: "Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal." 15 U.S.C. § 1.

**5.** For example, Wauwatosa paid Market Force 0.6% of the sale price as commission, Coldwell Banker paid 1.2%, and some firms paid nothing.

rect or circumstantial evidence that reasonably tends to prove that the manufacturer and others had a conscious commitment to a common scheme designed to achieve an unlawful objective.

*Id.* at 768, 104 S.Ct. at 1473. This standard was further refined in *Matsushita*, which, like the present case, involved the grant of the defendants' motion for summary judgment:

> To survive a motion for summary judgment or for a directed verdict, a plaintiff seeking damages for a violation of § 1 [of the Sherman Act] must present evidence "that tends to exclude the possibility" that the alleged conspirators acted independently. [*Monsanto,*] 465 U.S. at 764 [104 S.Ct. at 1471]. Respondents in this case, in other words, must show that the inference of conspiracy is reasonable in light of the competing inference of independent action or collusive action that could not have harmed respondents.

475 U.S. at 588, 106 S.Ct. at 1356.

■ These two cases suggest a two-part inquiry to determine whether summary judgment is appropriate in an antitrust conspiracy case:

> (1) is the plaintiff's evidence of conspiracy ambiguous, *i.e.,* is it as consistent with the defendants' permissible independent interests as with an illegal conspiracy; and, if so, (2) is there any evidence that tends to exclude the possibility that the defendants were pursuing these independent interests.

*Gibson v. Greater Park City Co.,* 818 F.2d 722, 724 (10th Cir.1987); *see also Riverview Invs., Inc. v. Ottawa Community Improvement Corp.,* 899 F.2d 474, 483 (6th Cir.1990); *Dreiling v. Peugeot Motors of America, Inc.,* 850 F.2d 1373, 1380 (10th Cir.1988); P. Areeda & H. Hovencamp, Antitrust Law § 316.1b, at 281–82 (1989 Supp.) (approving *Gibson* two-part inquiry). The Ninth Circuit adopted a similar two-part inquiry in *Richards v. Neilsen Freight Lines,* 810 F.2d 898 (9th Cir.1987):

> In antitrust cases, the analysis ... permits a defendant to rebut an allegation of conspiracy by showing a plausible and justifiable reason for its conduct that is consistent with proper business practice. Once a defendant has met this initial burden, a plaintiff must provide specific factual support for its allegations of conspiracy tending to show that the defendant was not acting independently.

*Id.* at 902 (citations omitted). The Second Circuit has also articulated the test as a shift in burdens. When the defendants establish that their conduct is consistent with independent action, the plaintiffs are required to come forward with evidence that tends to exclude the possibility of independent action. *H.L. Hayden Co. of New York, Inc. v. Siemens Medical Sys., Inc.,* 879 F.2d 1005, 1014 (2nd Cir.1989). This court has enunciated a similar formulation in *Valley Liquors, Inc. v. Renfield Importers, Ltd.,* 822 F.2d 656, 660–61 (7th Cir.), *cert. denied,* 484 U.S. 977, 108 S.Ct. 488, 98 L.Ed.2d 486 (1987), in which Judge Wood, writing for the court, held that the plaintiff failed to overcome a summary judgment motion because "it has not provided evidence tending to exclude the possibility that [the defendants] acted independently, or that would show that the inference of conspiracy to fix prices is reasonable in light of the competing inference of independent action." *See also Great Escape, Inc. v. Union City Body Co.,* 791 F.2d 532, 536–37 (7th Cir.1986).

#### B. *Application of the Standard to this Case*

Following the analytical model used in *Gibson, Richards, H.L. Hayden* and *Valley Liquors,* we shall examine the evidence of record to determine if Market Force's case can survive a motion for summary judgment. Accordingly, we shall first examine Market Force's evidence of a conspiracy among the defendants. Second, we shall examine whether the defendants have offered evidence tending to show that the conduct of which Market Force complains is as compatible with the defendants' legitimate business activities as it is with illegal conspiracy. Finally, if we conclude that the foregoing analysis leaves the evidence of conspiracy ambiguous, we shall then determine whether Market Force can point to any evidence that tends to exclude the pos-

sibility that the defendants were pursuing their legitimate independent interests.

### 1. Evidence of a Conspiracy

■ In its effort to establish a conspiracy, Market Force submitted evidence of a) the defendant companies' mutual awareness of each others' policies; and b) hostile comments allegedly made about Market Force.

### a) the circulation of policy statements

Market Force submitted evidence that some defendants had circulated buyers' broker commission rates and other firms had adopted policies regarding buyers' brokers after receiving the circulations. In late October 1987, Wauwatosa mailed to all members of the Milwaukee MLS copies of its policy expressing its intention to pay 20% of the selling agent's commission to buyers' brokers. After James Bruce, Coldwell Banker's chief operating officer, received a copy of the Wauwatosa policy, Coldwell Banker issued its own policy, setting the amount given as a commission at 20% of the total commission—half of the normal selling agent commission.[6] Other firms subsequently adopted similar policies. Equitable/Stefaniak Realty issued a policy identical to Wauwatosa's that became effective December 15, 1987. A copy of the policy was mailed to all Milwaukee MLS members. On December 16, 1987, Realty World–Bloomfield Realty mailed its policy statement. Its policy was identical to the higher Coldwell Banker rates. Copies of the policy were mailed to all MLS members.

There is evidence that these mailings prompted at least one real estate broker to adopt such a policy. Andrew Dean, president of Realty World–Dean Realty, adopted a buyers' broker policy on December 24, 1987. He testified at a deposition that he knew of no buyers' brokers operating in Milwaukee. Nevertheless, he wanted "to be one of the brokers in the area doing what everyone else is doing." R.87 Ex. 8 at 23.

Market Force characterizes Wauwatosa's circulation as "an implicit invitation to their competitors to adopt similar policies." Appellant's Br. at 32.[7] However, evidence that brokers were aware of other brokers' policies regarding buyers' brokers before enacting their own policy is nothing more than a restatement of conscious parallelism. Since conscious parallelism by itself is not enough to support an antitrust conspiracy case,[8] Market Force cannot rest only on examples of conscious parallelism to support its case.

---

**6.** See supra note 2.

**7.** To support this argument, Market Force cites a Fourth Circuit criminal antitrust case, United States v. Foley, 598 F.2d 1323 (4th Cir.1979), cert. denied, 444 U.S. 1043, 100 S.Ct. 727, 728, 62 L.Ed.2d 728 (1980). In Foley, a leading real estate broker had a dinner party and announced that he would raise his commissions. The other realtors soon followed suit. But the Foley court does not rely on the dinner party and announcement to find a conspiracy. There was other strong evidence: letters and phone calls among the realtors exhorting each other to charge the higher rate and fearing that deviation would ruin the plan. Based on that evidence, the court had little trouble affirming the conviction.

**8.** See Weit v. Continental Illinois Nat'l Bank & Trust Co., 641 F.2d 457, 462 (7th Cir.1981) (when defendant puts forward denials of conspiracy, "plaintiffs must come forward with some significant probative evidence which suggests that conscious parallelism is the result of an unlawful agreement"), cert. denied, 455 U.S. 988, 102 S.Ct. 1610, 71 L.Ed.2d 847 (1982); see also Cayman Exploration Corp. v. United Gas Pipe Line, Co., 873 F.2d 1357, 1361 (10th Cir. 1989) (plaintiff asserting conscious parallelism also needs to assert that action was against economic self-interest); Dunnivant v. Bi–State Auto Parts, 851 F.2d 1575, 1583 (11th Cir.1988) (plaintiff asserting conscious parallelism must come forward with "some 'plus' factor which tends to indicate the absence of independent action"); Royal Drug Co. v. Group Life and Health Ins. Co., 737 F.2d 1433, 1437 (5th Cir. 1984) (in order to survive summary judgment, "significant probative evidence of conscious parallelism is required, 'with ... some "plus" factor which tends to indicate that the asserted unilateral behavior was not such in fact....'") (quoting Paul Kadair, Inc. v. Sony Corp. of Am., 694 F.2d 1017, 1027 n. 27 (5th Cir.1983)), cert. denied, 469 U.S. 1160, 105 S.Ct. 912, 83 L.Ed.2d 925 (1985); Kreuzer v. American Academy of Periodontology, 735 F.2d 1479, 1487 (D.C.Cir. 1984) (proof of conspiracy requires more than parallel acts).

Moreover, it is well established that evidence of informal communications among several parties does not unambiguously support an inference of a conspiracy. *See Riverview Invs., Inc. v. Ottawa Community Improvement Corp.*, 899 F.2d 474, 484 (6th Cir.1990); *Bolt v. Halifax Hosp. Medical Center*, 891 F.2d 810, 827 (11th Cir.) ("That the defendants might have talked among themselves about [the plaintiff's business difficulties] is also insufficient to permit an inference of conspiracy."), *cert. denied*, ⸺ U.S. ⸺, 110 S.Ct. 1960, 109 L.Ed.2d 322 (1990); *Parkway Gallery Furniture, Inc. v. Kittinger/Pennsylvania House Group, Inc.*, 878 F.2d 801, 805–06 (4th Cir.1989) (evidence that dealers agreed with a ban on discounters not sufficient to support the inference of a conspiracy); *cf. Valley Liquors, Inc. v. Renfield Importers, Ltd.*, 822 F.2d 656, 662 (7th Cir.) (evidence of meetings among the defendants "is ambiguous at best and does not help to exclude the possibility" of independent action), *cert. denied*, 484 U.S. 977, 108 S.Ct. 488, 98 L.Ed.2d 486 (1987).

### b) hostile statements by defendants

As further evidence of conspiracy, Market Force also points to hostile statements attacking Market Force that were made by the defendants to home buyers, Market Force agents, and the MLS. The district court determined that the evidence put forward was insufficient to avoid summary judgment. We agree. The evidence before the district court suggests that there were several incidents in which harsh words were spoken. However, the incidents do not foreclose the conclusion that the competitors were not engaged in a conspiracy. The evidence of hostility appears as likely as not to be isolated incidents or merely "sales hype."[9]

### 2. Legitimate Business Justification for Actions

The defendants also offered legitimate business reasons for the actions that Market Force suggested were evidence of an illegal conspiracy. Coldwell Banker submits that the reason it sent out its policy was to inform other brokers that it would pay a lower fee to buyers' brokers. R.59 at 2. Wauwatosa asserts that the executive vice-president of the MLS told Joann Glawe that firms other than Market Force were acting as buyers' brokers, and that an appropriate way to inform them was to send the policy to all brokers. R.67 at 10–11. If the exchange of information regarding the commissions that the firms would pay is not unreasonable business behavior, then it is not an illegal agreement. *Supermarket of Homes, Inc. v. San Fernando Valley Bd. of Realtors*, 786 F.2d 1400, 1407 (9th Cir.1986); *cf. City of Long Beach v. Standard Oil Co.*, 872 F.2d 1401, 1406 (9th Cir.1989) (noting that competitors may exchange price information for legitimate business reasons), *cert. denied*, ⸺ U.S. ⸺, 110 S.Ct. 1126, 107 L.Ed.2d 1032 (1990).

### 3. Evidence Tending to Exclude Possibility of Independent Action

Because the evidence of the existence of a conspiracy among the brokers in Milwaukee is ambiguous, the plaintiff may survive summary judgment only by putting forth "evidence that tends to exclude the possibility that the defendants were pursuing ... independent interests." *Gibson v.*

---

**9.** We do not decide that hostile actions can never make out circumstantial evidence of a conspiracy. At least two other courts have determined that such actions may constitute proof of a conspiracy. *See Park v. El Paso Bd. of Realtors*, 764 F.2d 1053, 1059–61 (5th Cir.1985) (conspiracy found when hostile comments combined with predatory economic coercion and refusals to deal), *cert. denied*, 474 U.S. 1102, 106 S.Ct. 884, 88 L.Ed.2d 919 (1986); *Penne v. Greater Minneapolis Area Bd. of Realtors*, 604 F.2d 1143, 1148–49 (8th Cir.1979) (summary judgment should not have been granted where evidence of conspiracy included allegation of hostile comments, blacklisting, and punitive commission shares). *But see Supermarket of Homes, Inc. v. San Fernando Valley Bd. of Realtors*, 786 F.2d 1400, 1406, 1407 (9th Cir.1986) (confronted with evidence that real estate brokers made disparaging comments to potential home buyers about the plaintiff discount brokers, including that plaintiff was "no good, unethical, worthless and of generally bad repute," the court concluded that this conduct did not "add up to a conspiracy by the [defendants] to restrain trade").

*Greater Park City Co.*, 818 F.2d 722, 724 (10th Cir.1987).

According to Market Force, "[t]he lame nature of the excuses the companies muster for their referral policies is circumstantial evidence that the policies were adopted for other reasons. The reasonable inference is that the companies' real motivation was their predatory intent to drive buyers' brokers from the market before they could establish a foothold." Appellant's Br. at 43. However, in her affidavit, Joann Glawe of Wauwatosa enumerated several specific reasons for adopting a referral policy regarding buyers' brokers, including (1) that Wauwatosa paid the listing sales associate a greater commission in a sale involving Market Force, or allocated the gross commission among the listing and selling brokers and paid a referral fee to Market Force; (2) that a selling broker may still be involved in the transaction, as in the case of a sale generated from an open house; and (3) that a listing sales associate must do more work when there is no selling broker.[10] R.67 at 4–7. The district court concluded that there were plausible reasons for the firms each to adopt a policy about buyers' brokers. The court noted that Wauwatosa and Coldwell Banker put forth "independent business reasons ... [which were] not economically irrational." 706 F.Supp. at 1394. We agree. Market Force has not met its burden of providing "specific factual support for its allegations of conspiracy tending to show that the defendant was not acting independently." *Richards v. Neilsen Freight Lines*, 810 F.2d 898, 902 (9th Cir.1987). Accordingly, we cannot say that there is any genuine issue of triable fact requiring the reversal of summary judgment.

### Conclusion

The teaching of *Monsanto* and *Matsushita* is that, in order to survive a summary

judgment motion, a plaintiff must put forward evidence that tends to exclude the possibility of independent action. A defendant is entitled to summary judgment when it "provides a plausible and justifiable alternative interpretation of its conduct that rebuts the alleged conspiracy." *City of Long Beach v. Standard Oil Co.*, 872 F.2d 1401, 1406 (9th Cir.1989), *cert. denied,* —— U.S. ——, 110 S.Ct. 1126, 107 L.Ed.2d 1032 (1990). There is no evidence suggested by the plaintiff that sufficiently refutes the possibility that each defendant, acting independently, decided that the difference in services provided by buyers' brokers required a different referral policy than for standard seller brokers. We thus conclude that the district court correctly decided that the evidence left open the possibility of independent action despite the plaintiff's assertion that the defendants did not have a rational economic reason to adopt referral policies. Accordingly, the judgment of the district court is affirmed.

AFFIRMED.

---

**10.** "Because the buyer's broker represents only the buyer, the listing broker or some other representative of the seller must be present to represent the seller when a buyer tours a house. The buyer's broker is unable to demonstrate the house on behalf of the seller. The buyer's broker is unable to answer, on behalf of the seller, questions the buyer may have about the condi-

tion of the property, financing concessions, closing and occupancy dates, and the like. The listing broker is unable to give a lockbox combination to a buyer's broker. The Wauwatosa Realty Company listing agent is forced to fulfill many of the functions of the traditional selling agent in such transactions." R.67 at 7 (Glawe Affidavit).