**EHREDT UNDERGROUND, INC., Plaintiff,**

v.

**COMMONWEALTH EDISON COMPANY and International Brotherhood of Electrical Workers, Local No. 196, Defendants.**

No. 91 C 2361.

United States District Court, N.D. Illinois, E.D.

April 12, 1994.

---

Eugene G. Bruno, Richman, Lawrence, Mann, Greene & Mendelsohn, Gerard C. Smetana, Law Offices of Gerard C. Smetana, Chicago, IL, for plaintiff.

Gerald Allen Ambrose, James Stanton Whitehead, Brian Jeffrey Gold, Sidley & Austin, Chicago, IL, Robert Emmett Fitzgerald, Jr., Robert E. Fitzgerald, Jr., Ltd., Chicago, IL, for defendants.

## MEMORANDUM OPINION AND ORDER

ALESIA, District Judge.

This matter is before the court on the parties' objections to Magistrate Judge W. Thomas Rosemond's Report and Recommendation ("Report") on the motion by defendant Commonwealth Edison Company ("Edison") for summary judgment on Counts I, II, and IV of Plaintiff's First Amended Verified Complaint (the "Complaint").[1] Magistrate Judge Rosemond recommended granting defendant's motion for summary judgment on Count I, denying defendant's motion as to Count II, and granting summary judgment in part and denying it in part as to Count IV. For the reasons discussed below, the Court accepts the conclusions of the Report with respect to Count I and Count II. The Court sustains plaintiff's objection regarding its first claim under Count IV, and overrules plaintiff's objections to the Report as to the second claim under Count IV.

## I.  FACTS

### A.  Edison and URD Work

Plaintiff Ehredt Underground, Inc. ("Ehredt") is an Illinois corporation engaged in the business of underground excavation. Kenneth Ehredt is the corporation's president, manager and sole shareholder.

Edison is a public utility which provides electricity to approximately the northern one-third of Illinois. Under a contract entitled the General Joint Agreement ("GJA"), Edison and Illinois Bell Co. ("Illinois Bell"), a public utility responsible for providing local telephone service within Illinois, divide responsibility for installation of electrical and telephone cable. Geographic areas are divided up under the GJA, with either Edison or Illinois Bell accepting sole responsibility for installing both companies' equipment in the assigned area. The GJA provides that contractors laying cable for Edison also act as agents for Illinois Bell and lay telephone cable at the same time.

As part of the GJA, Edison is responsible for completing underground residential distribution work ("URD"), which includes digging, trenching for ground cable, installing various equipment, and connecting cable. Although Edison's own employees traditionally had performed URD work, in 1988 Edison management decided to hire outside contractors to perform some URD construction work in several of Edison's northern Illinois districts. In response to a request by officers from unions representing Edison employees, Edison agreed that it would contract out URD work only to companies whose employees were represented by unions.

---

1. This court previously granted defendant Local 196's motion to dismiss Count III. *Ehredt Underground, Inc. v. Commonwealth Edison Co.,* 830 F.Supp. 1083 (N.D.Ill.1993).

In late 1988, an Edison construction foreman invited Ehredt and several other contractors, including Trench–It, Inc. ("Trench–It") to perform URD work on a purchase-order basis. Ehredt and the other contractors began performing work for Edison in the North Shore and Crystal Lake Districts of Edison's northern division. At this time, Ehredt did not employ union labor. At some point in late 1988, however, Ken Ehredt was informed that its employees should be represented by a union in order to work for Edison.

Starting in November 1988, Ehredt asserts that certain Edison representatives informed Ehredt that it should provide kickbacks for the award of URD work. Ehredt refused these requests, although an Edison representative had related to Ehredt that Trench–It provided kickbacks to Edison supervisors.

In early 1989, Edison invited Ehredt, Trench–It, and several other contractors to submit bids for a contract to perform URD work. After the lowest bidder declined the contract, Edison awarded both Ehredt and Trench–It contracts to perform URD work. Both Ehredt and Trench–It performed contractor URD work in the Crystal Lake District during 1989 and 1990. Ehredt's 1989 Crystal Lake URD contract originally was set to expire October 31, 1989, but the contract was extended twice by the consent of all parties.

## B. *The Union Requirement*

Although Ehredt's employees were not represented by a union at the time Edison originally solicited Ehredt for a bid, Edison's bid proposal form requires bidding parties to identify the union with which the bidding party has a labor contract. Shortly after Ehredt submitted his bid, therefore, he began discussions with several unions. Ehredt eventually negotiated a two-year collective bargaining agreement with International Brotherhood of Electrical Workers, ("IBEW"), AFL–CIO, Local 336 ("Local 336"). The International approved the agreement on March 14, 1989.

Soon after the agreement was executed, certain parties began questioning Local 336's jurisdiction over Ehredt's employees. First,

Daniel Rosenmayer, president of Trench–It, complained to Harold Eastwood, business manager of Local 196, that Local 336 was representing employees in Local 196's jurisdiction. On May 9, 1989, James Conway, the International Vice President of the IBEW for the Sixth District, notified Thomas Beagley of Local 336 that Local 336 was not chartered for the type of work being performed by Ehredt employees. Conway stated that Local 196 was an IBEW-authorized union chartered for the work performed by Ehredt employees and, accordingly, Local 336 must terminate its collective bargaining agreement with Ehredt.

In response, Local 336 appealed Conway's decision to the International President of the IBEW, who has the sole authority to determine all jurisdictional disputes. The International President reversed Conway's decision, stating that the agreement between Local 336 and Ehredt Underground was valid. In November 1989, Conway again disputed the jurisdiction of Local 336 over Ehredt's employees, and in late November, the International President again stated that the agreement was valid.

Far from accepting the International President's decision, the opposition to Ehredt's Local 336 affiliation subsequently intensified its pressure on the International President to force Ehredt to switch unions. In January 1990 Harold Eastwood of Local 196 joined the battle and complained to the International President that Local 196 had jurisdiction over Ehredt employees. In January and March 1990, Conway sent two more letters to the International President. Finally, on March 13, 1990, the International President reversed his prior position and informed Local 336 that Local 196 had jurisdiction over Ehredt employees and Local 336 should not enter into further collective bargaining agreements with Ehredt. On July 17, 1990, the president of Local 336 notified Ehredt that the setting of pad transformers, pedestals, and switching gear for Edison was beyond the scope of the collective bargaining agreement between Ehredt and Local 336, because the existing agreement covered only trenching and cable laying. As such, Local 336 stated to Ehredt that it would not renew

its collective bargaining agreement with Ehredt following its expiration on October 31, 1990.

## C. *The Rest of the Story*

Although the above facts relate a fairly orderly though vigorous campaign to force Ehredt employees to affiliate with Local 196, Ehredt asserts a more sinister side to the crusade. Ehredt maintains that in late 1988, his workers noticed that they were being followed·from job site to job site. In April 1989 two Ehredt employees were attacked at a remote location while working on an Edison project. The two attackers first approached Ehredt manager Terry Counley while the other employee was away. The attackers asked to see Counley's union card, which he produced for them. After examining the card, the two men picked up some of Counley's equipment and dropped it in the trench. When Counley bent over to retrieve the equipment, the two men beat Counley. The attackers told Counley that "that's what he could expect if he ever worked in Cary, Illinois again." After releasing the brake on Ehredt's earth-moving equipment, the men departed.

Moments later, Local 196's business agent, Dave Lindsey, arrived at the job site and questioned Counley about switching from Local 336 to Local 196. Counley told Lindsey that he could not give him an answer and asked for Lindsey's card. Lindsey handed him Harold Eastwood's business card. Harold Eastwood was a business manager for Local 196 and participated in the dispute involving Local 336's jurisdiction over Ehredt employees.

On one occasion, Ehredt claims that Eastwood himself related to Counley and Ehredt that Ehredt's workers were in the wrong union, and that Local 196 was determined to obtain all work that it believed was within its jurisdiction. Eastwood stated that an Edison Board member was assisting him in getting rid of non-union excavation and cable installation contractors or getting them into Local 196.

Ehredt also alleges that he faced opposition on the job from Edison supervisors, despite Edison's overall satisfaction with Eh-

redt's work. As noted above, Edison extended Ehredt's contract twice between October 1988 and March 1990. Nevertheless, Douglas Hill, the supervisor in the underground construction department of Edison's Crystal Lake District, repeatedly threatened to terminate Ehredt and replace it with Trench–It. Ehredt asserts that Hill and other Edison employees consistently gave work to Trench–It that had been contracted to Ehredt. In addition, Hill often falsely blamed Ehredt for falling behind in its work and threatened·to give the work to Trench–It.

## D. *The 1990 Crystal Lake District Contract*

In January 1990, Edison began to solicit bids for a second contract. Prior to his bid submission, Ken Ehredt spoke with Douglas Hill, the Edison supervisor, about his bid strategy, stating that he would likely increase his bid by twenty-five (25) percent from the preceding contract. In a later conversation, Hill told Ehredt that once Trench–It won the contract, most of Ehredt's employees would probably quit and go to work for Trench-it. Ehredt was alarmed at the implications of the statement. Not only was Hill aware of Ehredt's bid strategy, but also Hill's statement implied to Ehredt that Edison would give Trench–It special consideration in the bidding process for the as-yet unawarded contract. Ken Ehredt went to Forrest Stahmer, Edison's Contract Coordinator, to express concerns about possible favoritism. Stahmer assured Ehredt that the bidding procedure was kept as apolitical as possible.

Ehredt's fears were confirmed when Trench–It's bid for the contract came in just below the figure Ehredt had disclosed to Hill. Ehredt, however, had not followed his original strategy; upon the request of an Edison employee, he had lowered rather than raised his contract price. Ultimately, on March 23, 1990, Edison awarded Ehredt a two-year contract for the Crystal Lake District, with the understanding that Ehredt would perform the work as a union contractor. Edison awarded Trench–It the backup 1990 Crystal Lake District URD contract.

Approximately three days after the contract was awarded, Hill called Ehredt's manager, Terry Counley, into his office. Hill told Counley that he did not think Ehredt could handle the work they had contracted to do and that he would "keep a close eye" on them. Further, Hill threatened to pull Ehredt off the job and give the work to Trench-It if Ehredt made "any wrong move." Ehredt asserts that although it made no "wrong moves," Hill began giving Crystal Lake work to Trench-It. Counley testified that on several occasions he arrived at the worksite only to find that the work had been done and, on one occasion, Counley arrived as Trench-It workers were completing the work.

At a January 2, 1991 meeting between Kenneth Ehredt and Terry Counley of Ehredt Underground and Janet Rudolph and George Adamaitis of Edison's purchasing department, Ken Ehredt complained to Rudolph about the work diverted to Trench-It. Rudolph assured Ehredt that Edison would stand by its contract and pay Ehredt for all excavation work performed in the Crystal Lake District if Douglas Hill gave the work away in violation of the contract. As yet, Edison apparently has not deemed any work done by Trench-It as violative of the Crystal Lake District contract because Edison has not paid Ehredt for any diverted work.

## E. *Finding a New Union*

Anticipating the expiration of its affiliation with Local 336, Ehredt contacted the Congress of Independent Unions ("CIU") in late July or early August 1990 about possible union representation. The CIU is a labor organization which is not affiliated with the AFL–CIO and is not organized by craft lines or geographic areas. The wage scale that would have been implemented under CIU representation was roughly comparable to the wages Ehredt paid under the Local 336 agreement.

Ken Ehredt notified James Harper, purchasing agent for Edison, that the CIU was under consideration as a possible replacement for Local 336. Harper referred the question of CIU representation to Daniel Shamblin of Edison's legal department. Three weeks later, Shamblin notified Harper

that contractors should not affiliate with any unions not affiliated with the AFL–CIO because Edison's own unions would not look favorably upon such an affiliation. Harper relayed this information to Ehredt.

Because of the new requirement of AFL–CIO affiliation, Ehredt began discussions with various AFL–CIO unions, including Local 150. Despite Local 150's AFL–CIO membership, Edison representatives Douglas Hill and James Harper related to Ehredt that Local 150 was not acceptable. Specifically, Hill told Ken Ehredt, "We don't want 150. Why don't you go with 196 and make everybody happy?"

Subsequently, in October 1990, Local 196 filed an intervenor petition with the National Labor Relations Board ("NLRB"), which scheduled an election for November 19, 1990. Local 196 now stepped up its efforts to pressure Ehredt and its employees to join Local 196. Agents from the International contacted Ehredt's employees at their homes in an effort to rally enough employee support. Agents of Local 196 assured Ken Ehredt that if Local 196 was given a collective bargaining agreement with Ehredt, the Local would assist in obtaining Edison's consent to price changes which would be necessitated under Local 196's higher price structure. Ehredt was also promised that Local 196 would permit him to continue running the company as he had under Local 336. On the basis of these oral agreements, Ehredt agreed not to oppose Local 196's appearance on the NLRB election, and he informed his employees of this fact.

Local 196 won the election unanimously, and on December 17, 1990, it executed a collective bargaining agreement with Ehredt. Ehredt claims that no negotiation over terms of the agreement was possible. The agreement provided for a wage scale that was nearly ninety (90) percent higher than the scale implemented under the agreement with Local 336.

Ehredt's 1990 Crystal Lake District contract was predicated on Local 336's wage structure, and Ehredt found that an adjustment in its contract was needed as a result of the new agreement with Local 196. Ehredt

requested a renegotiation of the contract. In early January, Janet Rudolph refused to renegotiate the contract and told Ehredt that unless he could adhere to his original bid, he would lose the contract. On January 14, 1991, Ehredt informed Janet Rudolph that he would not continue performing work under the terms of the 1990 Crystal Lake District URD contract, and that he was pulling his employees off the job. Ehredt performed no work for Edison after that date. Edison subsequently awarded the contract to Trench–It, and Trench–It hired eighty (80) percent of Ehredt's employees.

## F. *Ehredt's Complaint and the Magistrate Judge's Report*

In Counts I and II, Ehredt claims that Edison conspired to restrain trade in violation of sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1 and 2. In Count I, Ehredt alleges that Edison conspired with Illinois Bell to compel Ehredt to execute a collective bargaining agreement with Local 196. Ehredt asserts that this conspiracy had the effect of eliminating competitive bidding in the Crystal Lake District and raising the cost to consumers of electrical and telephone services. In Count II, Ehredt claims that Edison, Local 196, Local 336, the International, and Trench–It conspired to force Ehredt into executing a collective bargaining agreement containing ruinous economic terms, with the effect that Ehredt would be forced out of business and competition eliminated in the relevant market.

In Count IV, Ehredt alleges that Edison, through Douglas Hill, breached its contract with Ehredt under two theories. First, Ehredt claims damages through Hill's diversion to Trench–It of work which was originally assigned to Ehredt. Second, Ehredt asserts that Edison breached the covenant of good faith and fair dealing by rejecting the CIU as an acceptable union and by refusing to renegotiate its contract after implementing the collective bargaining agreement with Local 196.

The Magistrate Judge recommended that defendant's motion for summary judgment be granted as to Count I, denied as to Count II, and granted in part and denied in part as to Count IV. Plaintiff objects to the Magistrate Judge's recommendation to grant summary judgment on Count I and to grant summary judgment in part on Count IV. Defendant objects to the Magistrate Judge's recommendation to deny summary judgment as to Count II and as to part of Count IV.

## II. *DISCUSSION*

### A. *Standard of Review*

#### 1. *Summary Judgment*

Summary judgment is proper where the record shows that no genuine issue of material fact exists and the moving party must prevail as a matter of law. FED. R.CIV.P. 56(c); *Wigod v. Chicago Mercantile Exchange*, 981 F.2d 1510, 1514 (7th Cir.1992). In ruling, the court considers whether any rational trier of fact could find for the non-moving party. *Wigod*, 981 F.2d at 1514. Although the general rule is that a court must draw all inferences in favor of the nonmoving party, *Eastman Kodak Co. v. Image Technical Services, Inc.*, — U.S. —, —, 112 S.Ct. 2072, 2077, 119 L.Ed.2d 265 (1992), "antitrust law limits the extent to which permissible inferences from ambiguous evidence may be drawn." *Wigod*, 981 F.2d at 1514 (citing *Valley Liquors Inc. v. Renfield Importers, Ltd.*, 822 F.2d 656 (7th Cir. 1987)).

#### 2. *Magistrate Judge's Report and Recommendation*

A district court must make a *de novo* determination of any portion of the Report to which specific written objection has been made. The district judge "may accept, reject, or modify the recommended decision, receive further evidence, or recommit the matter to the magistrate with instructions." FED.R.CIV.P. 72(b); 28 U.S.C. § 636(b)(1). Therefore, this court will address both parties' objections and, applying the appropriate standard for summary judgment, make a *de novo* determination as to each objection.

### B. *The Antitrust Claims*

In Count I, Ehredt alleges that Edison and Illinois Bell conspired in restraint of trade to

require their contractors to use union labor. The Magistrate Judge recommended granting summary judgment. Ehredt makes two objections to the Magistrate Judge's recommendation. First, Ehredt objects to the Magistrate Judge's conclusion that Illinois Bell did not conspire with Edison. Ehredt maintains that by signing the GJA, Illinois Bell relinquished the right to make labor decisions in areas assigned to Edison under the GJA. Ehredt states that "a requirement by Edison that subcontractors be union becomes the agreement of its principal, Illinois Bell. This creates the necessary plurality of actors and agreement necessary under Section One of the Sherman Act." Plaintiff's Memorandum in Support of Objections, at p. 4. Second, Ehredt objects that the agreement between Edison and Ehredt violates Section One. This court disagrees with Ehredt's contentions for the reasons that follow.

### 1. *Liability Under Section One*

■ Section One of the Sherman Antitrust Act states that "[e]very contract, combination ... or conspiracy in restraint of trade or commerce ... is ... illegal." 15 U.S.C. § 1. The Supreme Court has held that on a motion for summary judgment an antitrust plaintiff alleging an agreement in restraint of trade must produce evidence sufficient to carry its burden of showing that the illegal arrangement existed. *Monsanto Co. v. Spray–Rite Serv. Corp.*, 465 U.S. 752, 763, 104 S.Ct. 1464, 1470, 79 L.Ed.2d 775 (1984). To meet this burden, a plaintiff must show by direct or circumstantial evidence "a conscious commitment to a common scheme designed to achieve an unlawful objective." *Id.* at 768, 104 S.Ct. at 1472. In regard to the motion for summary judgment on this anti-trust count, the court may not draw inferences that are "economically senseless." *Eastman Kodak Co. v. Image Technical Services, Inc.*, — U.S. —, —, 112 S.Ct. 2072, 2083, 119 L.Ed.2d 265 (1992) (explaining *Matsushita Elec. Industrial Co. v. Zenith Radio*, 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986)).

■ The Seventh Circuit applies a two-part test to determine whether summary judgment is proper in an antitrust conspiracy case. First, the court must assess whether the plaintiff's evidence of conspiracy is ambiguous. *Market Force Inc. v. Wauwatosa Realty Co.*, 906 F.2d 1167, 1171 (7th Cir. 1990). Evidence of a conspiracy will be considered ambiguous where the evidence "is ... as consistent with the defendants' permissible independent interests as with an illegal conspiracy." *Id.* If evidence is deemed ambiguous, the court must ask whether there is any evidence that "tends to exclude the possibility that the defendants were pursuing these independent interests." *Id.*

■ In light of these principles, we agree with the Magistrate Judge's finding that the record does not support the existence of a conspiracy between Edison and Illinois Bell. As an initial matter, we reject the notion that a contractual division of authority automatically makes one party to the contract a co-conspirator in illegal activities undertaken by the other party. As the Magistrate Judge pointed out, "[u]nder plaintiff's argument, every delegation of contracting authority from principal to agent would give rise to antitrust liability, as the agency agreement necessarily gives the agent the power to impose terms and conditions on third parties." Report, at p. 12. Ehredt has cited no authority that supports this extreme position, and this proposition contradicts the express mandate of *Monsanto* that a "*conscious* commitment" must be made to the unlawful scheme. *Monsanto*, 465 U.S. at 764, 104 S.Ct. at 1471.

■ Without Ehredt's theory of conspiracy through contract, we are left to examine the record for evidence that Illinois Bell and Edison conspired to require contractors to use union labor. As the Magistrate Judge noted, the only so-called evidence of agreement to use union labor is that both Edison and Illinois Bell use union labor. Applying the standard for summary judgment enunciated by the Seventh Circuit, it is clear that Ehredt cannot even reach the threshold of "ambiguous" evidence of a conspiracy, as there is simply no evidence in the record suggesting Edison and Illinois Bell conspired, other than the similar union requirement. Where the defendant has come for-

ward with a sufficient legitimate business justification, evidence of parallel business behavior, absent more, cannot defeat a motion for summary judgment. *American Floral Services, Inc. v. Florists' Transworld Delivery Ass'n*, 633 F.Supp. 201, 211 (N.D.Ill. 1986). Here, Edison has explained that it requires its contractors to use unionized labor to improve internal relations. In the context of this case, this is sufficient to shift the burden back to Ehredt to produce "some significant probative evidence which suggests that conscious parallelism is the result of an unlawful agreement." *Weit v. Continental Illinois Nat'l Bank & Trust Co.*, 641 F.2d 457, 462 (7th Cir.1981) (citing *First National Bank of Arizona v. Cities Serv. Co.*, 391 U.S. 253, 289–90, 88 S.Ct. 1575, 1592–93, 20 L.Ed.2d 569 (1968); *Modern Home Inst. Inc. v. Hartford Accident and Indemnity Co.*, 513 F.2d 102 (2d Cir.1975)). We agree with the Magistrate Judge that Ehredt has not and cannot meet its burden.

Moreover, we note that a conspiracy between Edison and Illinois Bell to require contractors to use union labor makes no economic sense. From a financial standpoint, Edison and Illinois Bell would have an economic incentive *not* to use union labor because forcing contractors to use union labor would result in higher costs for the utilities. On the other hand, Edison's assertion that it uses union labor to improve internal labor relations is a feasible explanation. The compelling inference is that both Edison and Illinois Bell independently and legitimately arrived at their decisions to require union labor.

### 2. *"Unilateral Conspiracy"*

■ Ehredt next objects to the Magistrate Judge's conclusion that the URD contract between Edison and Ehredt may not form the requisite Section One "agreement." Essentially, Ehredt contends that the contract amounts to an illegal agreement by two employers "fixing the wage at which one or both pay their employees." Plaintiff's Memorandum in Support of Objections, at p. 2. Ehredt argues that the URD contract provided that Ehredt must sign a collective bargaining agreement with a union, and in turn, the

collective bargaining that he signed contained uniform wage provisions. Therefore, Ehredt contends, the existence of the collective bargaining condition in the URD contract defeats Edison's motion for summary judgment.

This novel position is not supported by any authority and is contrary to reason. As the Magistrate Judge correctly found, Edison's inclusion of the collective bargaining provision in its URD contracts was "for the legitimate and rational business purpose of maintaining a productive and agreeable relationship with its work force, which consisted primarily of union members." Report, at p. 17. By no rational interpretation can the collective bargaining provision be considered an illegal price-fixing condition. There is no reference whatsoever in the URD contract to an amount of wages Ehredt must pay his employees. Finally, as the Magistrate Judge observed, allowing a party to sue under the Sherman Act to recover damages "suffered as a result of another party's insistence on 'restrictive' terms in a contract.... would make every contract illegal, as all contracts place restraints and restrictions on the parties who enter them." Report, at p. 15.

In sum, Ehredt has presented no evidence from which this court could find that a conspiracy or unlawful agreement existed between Edison and Illinois Bell or Edison and Ehredt. Thus, Ehredt's objections to the Magistrate Judge's recommendation on Count I are denied, and defendant's motion for summary judgment on Count I is granted.

### 3. *Count II*

Count II of Ehredt's Complaint alleges that Edison, Local 196, Local 336, the International, Trench–It and certain employees of Edison conspired to force Ehredt to contract with Local 196 for the purpose of forcing Ehredt out of the URD industry. Ehredt's theory of the case may be stated as follows. Certain Edison employees wanted Trench–It, and not Ehredt, to perform URD work for Edison because Trench–It provided kickbacks to the Edison employees and because seven Edison employees had family members employed by Trench–It. Edison, Edison em-

ployees, Trench–It and Local 196 conspired to force Ehredt to breach its contract. Edison employees, Local 196, and Trench–It pressured the International President until he expelled Ehredt from Local 336. After the expulsion from Local 336, Edison railroaded Ehredt into signing a collective bargaining agreement with Local 196 that contained ruinous economic terms. The object of the conspiracy was achieved when Ehredt was forced to discontinue working for Edison, and Trench–It was awarded the URD contract.

The Magistrate Judge recommended that defendant's motion for summary judgment on Count II be denied. The Report concluded that the record supported the rational inference that a conspiracy existed between certain Edison employees, Trench–It and Local 196. The Magistrate Judge further found that this inference was economically rational and more persuasive than the inference that each of the parties was acting independently and in furtherance of legitimate business goals.

Edison objects to the Magistrate Judge's recommendation on several grounds. First, Edison contends that central to Ehredt's claim is the contention that Edison conspired with its own employees, and that an antitrust conspiracy may not be based on such a conspiracy. Second, defendants argue that the Magistrate Judge improperly relied on no more than allegations of the Complaint to support its inferences that Edison acted improperly. Edison argues that Ehredt must bring forth additional evidence of the conspiracy to survive a summary judgment motion. Finally, Edison asserts that the Magistrate Judge's Report is filled with factual errors that destroy the inferences upon which the Report relies to find a basis for an anticompetitive conspiracy.

Essentially, Edison's objections boil down to the core contention that Ehredt has not brought forth any evidence implicating Edison in the conspiracy, other than that regarding Edison employees whose conduct is not chargeable to Edison. Therefore, in order to thoroughly address Edison's objections, it is necessary to examine the specific evidence Ehredt avers and what rational inferences may be drawn from that evidence.[2]

### (a) *Local 196*

■ Ehredt alleges that Local 196 conspired with Edison and Trench–It to force Ehredt to enter into a collective bargaining agreement with Local 196 for the purpose of driving Ehredt out of business. The record demonstrates that Local 196 complained to the International in January 1990 that Local 336 was representing employees that were in Local 196's jurisdiction. The record also states that two Ehredt employees suffered a beating at a remote worksite and that the assailants likely were associated with Local 196, especially in light of the solicitation on behalf of Local 196 moments after the attack. Ehredt also alleges that the business agent for Local 196 indicated to Ken Ehredt and Terry Counley that Ehredt was in the wrong union and that an Edison Board member was assisting Local 196 in getting rid of non-union contractors or getting them into Local 196.

Upon examination of this evidence, we find that the inference is unmistakable that Local 196 wanted Ehredt to affiliate with Local 196, and may have used coercive and abusive means to go about urging membership. The evidence, however, does not go beyond this inference. The only evidence connecting Local 196 to a concerted action with Edison and Trench–It is Eastwood's boasting about his Edison connection[3] and the fact that Trench–It's president first complained to Eastwood about the jurisdictional question.

---

**2.** We will address the evidence with respect to alleged co-conspirators Local 196, Edison, Edison employees and Trench–It. The record is devoid of any evidence implicating the International and Local 336 in the conspiracy.

**3.** We note, however, that although this evidence may evince a connection between Edison and Local 196, it does not show that Local 196 had

any interest in forcing Ehredt out of business. In fact, Eastwood's statements could be more easily read to support the opposite proposition, because Eastwood stated that the Edison official was helping to get contractors into the union. Logically, a union does not recruit members only to effectuate their unemployment by its "ruinous" collective bargaining agreement.

Applying the standard enunciated in *Market Force*, the conspiracy is ambiguous at best. Substantial evidentiary support exists in the record to infer that Local 196 was acting in its own, legitimate interest in obtaining Ehredt's membership into the union. On the other hand, there may be some evidence to indicate that Local 196 had some contact with either Trench–It or Edison in connection with the union jurisdiction dispute. Thus, drawing all reasonable inferences in favor of the plaintiff, it is possible, although remote, to say that ambiguous evidence of an antitrust conspiracy exists.

■ Defendants, however, have rebutted the inference of Local 196's involvement in the conspiracy. It is economically senseless for Local 196 to go through all of the trouble questioning jurisdiction and harassing Ehredt into signing a collective bargaining agreement, only to watch the terms of the agreement force Ehredt out of business. Ehredt has identified no reason that would explain why Local 196 would undertake a campaign to recruit union members for the purpose of putting them out of work. In addition, Local 196 appears to have had a legitimate reason to contest Local 336's jurisdiction over Ehredt employees. *See Market Force, Inc.*, 906 F.2d at 1171 (evidence tending to exclude the possibility of legitimate, independent interests is needed to support ambiguous conspiracy evidence). Local 196 contended that Local 336 was not chartered for the type of work being performed by Ehredt employees, specifically the setting of pad transformer, pedestal and switching gear. Thus, the only rational inference supported by the record is that representatives from Local 196 pressured Ehredt into signing a collective bargaining agreement because Local 196 wanted Ehredt's membership and jurisdiction over all URD workers in the area.[4] As such, plaintiff has offered no rational evidence to infer that Local 196 en-

tered into an unlawful agreement in restraint of trade.

#### (b) *Trench–It*

■ Unlike the evidence surrounding Local 196, it is not difficult to infer from the evidence that Trench–It would like to have seen Ehredt put out of business. With respect to Trench–It, the record shows that Daniel Rosenmayer, the president of Trench–It, instigated the union jurisdiction dispute surrounding Ehredt's Local 336 affiliation. Moreover, Eastwood, Local 196's business manager, testified that Rosenmayer related to him that Trench–It lost the 1990 URD contract to Ehredt because of Local 336's lower wages. We agree with the Magistrate Judge's finding that "[i]t is difficult to imagine what legitimate business goals Rosenmayer could have had in initiating a union jurisdiction dispute over another company's employees—as president of a company, Rosenmayer's labor concerns should have extended no further than determining which union, if any, would represent *his* employees." Report, at p. 20.

This evidence, however, does not demonstrate an anti-trust violation. While Rosenmayer's tactics relating to the union jurisdiction dispute may not have been pristine, they cannot amount to a conspiracy in restraint of trade. The most that can be inferred from Rosenmayer's actions is that, with the intent to force Ehredt to repudiate its Edison contract, he contacted the unions to ensure that Local 336 was within its proper union-defined, jurisdictional boundaries. At this point, Rosenmayer had done nothing to violate the Sherman Act because no agreement was made between two entities to restrain trade. Subsequently, James Conway, International Vice President of the IBEW for its Sixth District, began a concerted effort to see that its jurisdictional restrictions were followed. At this point, still no actionable

---

4. The record reveals that Local 196's campaign to recruit Ehredt was undertaken at the urging of Daniel Rosenmayer, president of Trench–It. This fact does not help Ehredt's case. As stated above, Trench–It's and Local 196's goals in pressuring Ehredt to switch unions were distinct. Trench–It wanted Ehredt to pay higher wages so it could compete with Ehredt for the URD con-

tract, while Local 196 wanted Ehredt's membership. In order to find an antitrust conspiracy with a labor union based on a collective bargaining agreement, the goal between co-conspirators must be a common one. *Mid–America Regional Bargaining Assn. v. Will County Carpenters Dist. Council*, 675 F.2d 881, 889 (7th Cir.1982).

conspiracy is shown to exist because no agreement for an unlawful purpose has been shown. Subsequently, after the jurisdictional plea was initially rejected, both Conway and Rosenmayer complained vigorously to the International President to reverse himself and find that Local 336 had no jurisdiction over Ehredt's employees. On March 13, 1990, he, indeed, reversed his prior decision. He ultimately determined that Local 196 had jurisdiction over Ehredt's employees and that Local 336 did not and should refrain from entering into further collective bargaining agreements with Ehredt. Plaintiff does not allege that the ultimate decision regarding jurisdiction was made other than in good faith. As such, no agreement to achieve an unlawful purpose can be shown between Rosenmayer and/or Trench–It and the International. From all the evidence, the most that can be inferred is that Trench–It maliciously initiated a union jurisdiction dispute and that the union then, independently and lawfully, decided a union dispute through its intra-union procedures. We cannot conclude that a plaintiff demonstrates an antitrust violation by alleging that an entity participated in a union jurisdictional dispute regarding a competitor. As such, Ehredt's allegations do not amount to an anti-trust conspiracy between Trench–It and the International.

### (c) Edison

■ Next, the Report concludes that Edison conspired to frustrate Ehredt's ability to compete with Trench–It through Edison's application of its union affiliation requirement. The Magistrate Judge noted that, at the outset of Edison's relationship with Ehredt, Edison required union affiliation, but not with any specific union. Later, Edison, through Daniel Shamblin, determined that the union must be AFL–CIO affiliated. Regarding this requirement, the Magistrate Judge found the following:

> This application of the [union-affiliation] policy, which was inconsistent with both the original union requirement and Edison's policy toward other contractors, is unsupported by any legitimate business justification. Therefore, the inference that the policy was applied to Ehredt for the purpose of finishing Ehredt off in the URD

market must be seen as the exclusive inference.

•  •  •  •  •

> The fact that the Local 196 requirement apparently ran counter to Edison's economic self-interest in the URD contract market strengthens the circumstantial evidence ... which suggests strongly that the policy was imposed as the *coup de grace* in a campaign organized by Edison, Trench–It and Local 196 to drive Ehredt out of the URD market.

Report, at pp. 27, 29. Edison objects to this characterization of its union requirement as an indicator of Edison's anticompetitive objective. Edison asserts that any inference of conspiracy is refuted by other evidence in the record.

We agree with Edison and sustain its objection. Any negative inference drawn from Edison's union requirement is refuted by stipulated evidence in the record and the lack of economic rationale for Edison to conspire. Under the *Market Force* test, evidence of an antitrust agreement is considered ambiguous where the evidence "is ... as consistent with the defendant's permissible independent interests as with an illegal conspiracy." *Market Force, Inc.*, 906 F.2d at 1171. It is far more likely that Edison refused the CIU for legitimate business reasons rather than as a calculated move designed to ultimately force Ehredt into breaching its contract.

First, as provided in the Statement of Uncontested Facts, Daniel Shamblin unilaterally made the decision to reject the CIU. His decision was based, as Ehredt has stipulated, on Shamblin's concern about work stoppages and difficulties with Edison's other unions. Final Pretrial Order—Uncontested Facts, ¶ 100. Shamblin made his decision without contacting or consulting anyone outside of Edison. *Id.* As such, Edison was acting independently when it made the decision to reject the CIU. We disagree with the Magistrate Judge's conclusion that the decision to reject a union not affiliated with the AFL–CIO was unsupported by any legitimate busi-

ness justification. Preserving internal relations is an acceptable business justification.[5]

Even assuming that Ehredt's evidence of Edison's involvement rose to the level of ambiguity, this court could not rationally find that Edison participated in the conspiracy because such participation would have been economically senseless. Conspiring to force out the low-bid contractor to replace it with a higher cost contractor is contrary to Edison's economic self-interest. We disagree with the Magistrate Judge's finding that the inference of Edison's involvement is *strengthened* because such a requirement is against Edison's self-interest. To the contrary, conduct not supported by any economic rationale is persuasive evidence *against* the finding of an antitrust conspiracy. *See Matsushita Elec. Industrial Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986); *Eastman Kodak Co.,* — U.S. at ——, 112 S.Ct. at 2083; *Market Force, Inc.,* 906 F.2d at 1171.

The record also supports, overwhelmingly, the overall fairness and unbiased attitude of Edison towards Ehredt. First, despite Hill's apparent ill will towards Ehredt from as early as November 1988, Edison not only extended Ehredt's first contract, but it also accepted Ehredt's choice of unions—Local 336. Second, although Ehredt had ongoing concerns about neutrality of the bidding process, the procedure ultimately was conducted in a fair manner, and Ehredt won its second contract. Finally, when Ken Ehredt expressed his concerns to Janet Rudolph, she affirmed Edison's commitment to "stand by" the URD contract.

Therefore, with respect to Edison's involvement as a public utility in the antitrust conspiracy, we disagree with the Magistrate Judge that the record supports an inference suggesting Edison acted with anticompetitive intent. This determination, however, does not fully answer the question of Edison's liability in the antitrust context.

#### (d) *Edison Employees*

Although Edison argues that the conclusion that Edison was not involved in the alleged conspiracy should be the end of the argument, Ehredt maintains and the Magistrate Judge found that Edison employees participated in the conspiracy with Trench–It to oust Ehredt, and that Edison may be found liable under antitrust law for its employees' conduct. Before turning to the legal question of whether Edison can be found liable in an antitrust context for the actions of its employees, however, we turn to the record to determine if the inference that Edison employees conspired with Trench–It can be supported.

In particular, we agree with the Magistrate Judge's determination that the suspect behavior of Douglas Hill, the Edison supervisor, indicates that he wanted Trench–It and not Ehredt performing the URD contract. The evidence strongly suggests that Hill leaked Ehredt's bid strategy for the 1990 Crystal Lake District URD contract to Trench–It, as Trench–It's bid came in just below the figure Ken Ehredt had disclosed to Hill. Notably, when Ehredt won the contract after changing its bid strategy, Hill reacted by becoming furious and threatening Ehredt that he would give the contract to Trench–It if Ehredt made "any wrong move."

Second, after Ehredt began working for Edison under the 1990 URD contract, Hill continued his attempts to sabotage Ehredt. Hill made repeated threats to pull Ehredt off the job, despite Ehredt's satisfactory performance. Ehredt's foreman, Terry Counley, testified that work assigned to Ehredt was diverted to Trench–It. When Ken Ehredt confronted Hill about the transfer of Ehredt's work to Trench–It, Hill retorted that "[i]t's none of your damn business what I do with this work." Report, at p. 24.

Other evidence also implicates Hill in wrongdoing. Ken Ehredt testified that he

---

**5.** In addition, we disagree that Local 196 was the only acceptable union to Edison. The remarks made by Douglas Hill concerning the desirability of Local 196 over Local 150 is not necessarily indicative of Edison's decision whether Local 150 would be an acceptable union. Shamblin,

not Hill, made decisions regarding union affiliation. Furthermore, Local 336 had been accepted by Edison. The union itself, not Edison, determined that Ehredt must be represented by Local 196.

approached Hill and Frank King, Edison's Crystal Lake District area foreman, about Edison's failure to pay Ehredt for completed work. King stated that Ehredt had "to pay the piper." Ehredt contends that this was a reference to paying kickbacks to Edison employees. In sum, we agree with the Magistrate Judge's conclusion:

> [E]ven if Hill's discussion with Ehredt concerning Ehredt's bid plans for the 1990 Crystal Lake Contract was held for the legitimate business reason of providing assistance to potential bidders, Hill's subsequent behavior—his prediction of Trench-It's winning the bid, repeated threats against Ehredt, transfer of work to Trench-It, and the reference to kickbacks made by one of his subordinates in his presence—gives rise to the unmistakable inference that Hill discussed bids for the purpose of leaking bid information to Trench-It in order to deprive Ehredt of the opportunity to win a competitive bid. Such conduct is illegal per se under the Sherman Act. *See United States v. W.F. Brinkley & Son Constr. Co.*, 783 F.2d 1157, 1161 (4th Cir.1986).

Report, at pp. 25–26.

In addition, the actions of Hill and Trench-It, viewed together, raise a strong inference that Hill and Trench-It acted in concert for the common goal of forcing Ehredt to breach its contract. While Hill used intimidation and provided Trench-It with confidential information, Trench-It apparently agreed to receive and utilize bid information and to receive work wrongfully diverted from Ehredt. Ehredt has asserted adequate evidence in the record to support an inference that Edison employees had an incentive to see Trench-It, rather than Ehredt, perform the URD contract, whether because of a financial gain through kickbacks from Trench-It or a desire to further the interests of family members employed by Trench-It. This scenario is also consistent in a larger context: the actions of Hill and others are not consistent with Edison's economic interests, but are consistent with the interests of an employee whose own fortunes bear no immediate relation to the price paid by Edison for URD work. Thus, we find sufficient evidence from which to draw the inference that Hill and possibly other Edison employees [6] conspired with Trench-It to put Ehredt out of business.

### (e) *Edison's Liability for its Employees' Actions*

Edison, however, strenuously urges this court that such a conspiracy—between Edison employees and Trench-It—cannot form the basis of an antitrust conspiracy involving Edison. Edison avers that Hill was acting outside the scope of his authority, and to the extent that he acted unlawfully and in a manner injurious to Edison, Edison is not liable for his conduct. In contrast, the Magistrate Judge found that Hill was acting within the scope of his authority during the period in question, and was purporting to act on Edison's behalf. For these reasons, the Magistrate Judge found that Hill's actions could be charged to Edison. Report, at p. 26.

In *American Society of Mechanical Engineers, Inc. v. Hydrolevel Corp.*, 456 U.S. 556, 102 S.Ct. 1935, 72 L.Ed.2d 330 (1982), the Supreme Court held that a corporation could be held liable in an antitrust action for actions undertaken by its agent under cloak of apparent authority. In *ASME*, a chairman of one of defendant's subcommittees issued an "unofficial response" condemning a competitor's product which ultimately led to the competitor's failure. This action by the corporation's agent was asserted as a basis for imposing antitrust liability on the defendant non-profit corporation. The Court found that the corporation had cloaked the subcommittee official with apparent authority, and "permit[ted] those agents to affect the destinies of businesses and thus g[ave] them the power to frustrate competition in the marketplace." *Id.* at 571, 102 S.Ct. at 1945. The Court defined apparent authority as "the power to affect the legal relations of another

---

**6.** The record also indicates that Frank King, Edison's area foreman for the Crystal Lake District, was likely a participant in the conspiracy. In the presence of Douglas Hill, King told Ken Ehredt that he had to "pay the piper." Ehredt alleges that this statement intimated to him that he had to pay a kickback.

person by transactions with third persons, professedly as agent for the other, arising from and in accordance with the other's manifestations to such third persons." *Id.* at 566 n. 5, 102 S.Ct. at 1942 n. 5 (citing Restatement (Second) of Agency § 8 (1957)). The Court rejected the defendant's argument that it should not be held liable unless its agents acted with intent to benefit the corporation, and stated that "whether [the agents] act in part to benefit [the principal] or solely to benefit themselves or their employers, [the] agents can have the same anticompetitive effects on the marketplace." *Id.* at 574, 102 S.Ct. at 1946. The Court also found that the defendant need not have ratified the agent's actions because imposing such a rule would allow a defendant corporation to avoid antitrust liability by ignoring its agents' conduct and would encourage corporations to do as little as possible to oversee its agents. *Id.* at 573, 102 S.Ct. at 1946.

Analogous cases have similarly concluded that employees who affect decision-making authority on behalf of the corporation possess apparent authority or represent the corporation's intent. *See United States v. Basic Constr. Co.,* 711 F.2d 570 (4th Cir.1983) (holding that a corporation will be held criminally responsible for antitrust violations committed by employees who acted with apparent authority and for the benefit of the corporation; corporate intent is shown by actions and statements of employees in positions of authority or have apparent authority to make policy decisions). In addition, the Seventh Circuit has found that, under *ASME,* "principals are liable when their agents act with apparent authority and commit torts even if the principal derives no benefit from the agent's actions and even if the agent acts entirely for his own purposes." *United States v. One Parcel of Land,* 965 F.2d 311, 319 (7th Cir.1992). According to that court, the relevant inquiry into apparent authority asks "whether to a third party the agent appears to be acting in the ordinary course of the business provided to him." *One Parcel of Land,* 965 F.2d at 319; *but see Union City Barge Line, Inc. v. Union Carbide Corp.,* 823 F.2d 129 (5th Cir.1987) (refusing to hold defendant corporation responsible in antitrust for criminal acts of its employee which were outside of his authority).

We hold, therefore, that the allegations and evidence suffice to raise a genuine issue of material fact as to whether Hill acted with sufficient apparent authority in conspiring with Trench–It in order to hold Edison responsible for any anti-trust violations. Hill possessed authority to apportion work between Ehredt and Trench–It. As such, Hill possessed authority to "affect the destinies of businesses and ... frustrate competition in the marketplace." *See ASME,* 456 U.S. at 571, 102 S.Ct. at 1945. The record demonstrates that an agreement may have existed between Hill and Trench–It to restrain trade. Furthermore, we hold that Ehredt may be able to show that Hill and other Edison employees were acting sufficiently within their apparent authority when diverting work to Trench–It and by-passing the competitive process to hold Edison, as principal, responsible under Section One of the Sherman Act. Edison's Motion for Summary Judgment on Count II is therefore denied insofar as the plaintiff alleges a conspiracy in restraint of trade between Edison and Trench–It. Plaintiff has alleged no other actionable conspiracy and, as such, all other allegations in Count II of agreements in restraint of trade are stricken.

### 4. *Count IV*

In Count IV, Ehredt alleges that Edison breached the 1990 Crystal Lake District URD contract. Ehredt sets forth two specific theories for the breach for which he seeks recovery. Ehredt first claims that Edison breached the URD contract when Hill diverted work to Trench–It. Second, Ehredt alleges that Edison breached the covenant of good faith and fair dealing by (1) refusing the CIU as an acceptable union replacement for Local 336 and (2) refusing to renegotiate the URD contract to reflect Ehredt's higher labor costs as a result of his agreement with Local 196.

### (a) *Ehredt's First Claim: Improper Diversion of Work*

The Magistrate Judge recommended granting Edison's motion for summary judgment on the first theory of recovery. The

Magistrate Judge found that Janet Rudolph's response to Ehredt that Edison would pay Ehredt for all URD work in the Crystal Lake District diverted to Trench–It in violation of the contract was dispositive evidence that Ehredt suffered no damages as a result of the alleged transfers of work to Trench–It. Report, at pp. 31–32. Ehredt objects to this conclusion, arguing that Rudolph's response demonstrates rather than relieves Edison's liability. Ehredt has produced Trench–It's paid invoices for work done during the contract period in the Crystal Lake District, and asserts that Edison has not paid him for this work.

We agree with Ehredt and sustain its objection. Ehredt has stated a valid claim under this theory and Rudolph's promise to pay for diverted work only strengthens Ehredt's case. In its brief, Edison stated that "Edison fulfilled its obligations under its contract with plaintiff by *agreeing* to pay for all work plaintiff was contractually entitled to perform." Edison's Motion for Summary Judgment On Count IV of the Complaint, ¶ 4 (emphasis added). We disagree. Edison will fulfill its obligations to Ehredt under the contract when it *pays* Ehredt for the work it was entitled to perform. Edison's contention that Rudolph's promise to fulfill Edison's contractual obligations entitles it to summary judgment is erroneous. Rudolph's promise to pay does nothing to alleviate the damages Ehredt has suffered as a result of the alleged breach of contract. Ehredt's objection to the Magistrate Judge's recommendation on the first claim of Count IV is sustained.

### (b) *Ehredt's Second Claim: Breach of Duty of Good Faith and Fair Dealing* [7]

The Magistrate Judge recommended granting summary judgment in favor of Edison on Ehredt's claim that Edison's failure to recognize the CIU breached the express terms of the URD contract. He recommended denying summary judgment on Ehredt's claim that the denial resulted in a breach of the covenant of good faith and fair dealing. Ehredt does not object to the Magistrate Judge's recommendation to grant summary judgment under the first theory of this claim. Therefore, this court accepts the recommendation as to the first theory of liability on Ehredt's second claim that Edison breached the URD contract by refusing to accept the CIU as an acceptable union.

With respect to the second part of this claim, the Magistrate Judge found that Edison had unilaterally changed its union requirement to include only those unions affiliated with AFL–CIO "to the discrete disadvantage of Ehredt." Report, at p. 34. Because Edison was vested with discretion to approve of Ehredt's suggested union, the Magistrate Judge found that a question existed as to whether Edison exercised its discretion reasonably and with proper motive. Report, at p. 34.

Edison objects to the Magistrate Judge's recommendation, arguing that Edison's refusal of the CIU cannot possibly be considered in bad faith because Ehredt has stipulated in the Statement of Uncontested Facts that it was not. Paragraph 100 of this Statement states that Shamblin, Edison's manager responsible for rejecting the CIU, rejected the CIU "because Edison faced considerable risk of work stoppages and difficulties with its own unions and from building trades unions if its contractors employed members of the CIU." Ehredt has also stipulated that Shamblin's decision was made without contacting anyone outside of Edison. Therefore, Edison claims, the decision to reject the CIU cannot have been made in bad faith.

Because the record contains no evidence whatsoever contradicting the above stipulations, we agree with Edison and sustain its objection as to this claim. Ehredt does not implicate Shamblin in any other way as involved in wrongdoing, and there is simply no evidence supporting the contention that he was motivated by something other than legitimate business concerns. Thus, viewing the evidence in the light most favorable to Eh-

---

**7.** Edison states that "[i]t appears that the Magistrate Judge's Report is also intended to be a ruling on Edison's Motion *in Limine* ... to exclude legal theories." This is not the case; Edison's Motion *in Limine* was not decided by the Magistrate Judge and is still pending before the court.

redt, we are unable to conclude that Edison's decision not to accept the CIU could have breached the covenant of good faith and fair dealing. This theory supporting the breach of contract claim is dismissed as having no basis in fact.

 The Magistrate Judge next recommended denying Edison's motion for summary judgment on Ehredt's claim that Edison breached the duty of good faith and fair dealing by refusing to renegotiate the 1990 Crystal Lake Contract following Ehredt's signing with Local 196. The Magistrate Judge found that although parties are not required to renegotiate contracts when circumstances change, the facts of the case warranted departure from this rule. The Magistrate Judge found that the change in circumstances—Ehredt's higher cost—was the result of a unilateral decision by Edison. The Magistrate Judge stated that "[i]f the covenant of good faith and fair dealing means anything at all, it means that a party cannot use its unilateral discretion to change the conditions underlying the contract and then refuse to renegotiate the terms of the contract. That is precisely what appears to have occurred in this case...." Report, at p. 36.

Edison objects to the Magistrate Judge's determination, stating that the law does not recognize any "good faith" duty to renegotiate because of a change in circumstances. We agree with Edison that Illinois law does not recognize a duty to renegotiate upon a change in circumstances. *USX Corp. v. International Minerals & Chemicals Corp.*, 1987 WL 20427, *6, 1987 U.S. Dist. LEXIS 10914, *20 (N.D.Ill.1987); *see M.A.T.H, Inc. v. Housing Auth. of East St. Louis*, 34 Ill.App.3d 884, 341 N.E.2d 51, 53 (5th Dist.1976) (no duty to renegotiate housing contract pursuant to the Illinois Housing Authorities Act due to an alleged change of circumstances); *cf. Bane v. Ferguson*, 707 F.Supp. 988, 994 (N.D.Ill.) (finding that under Illinois law, duty of good faith and fair dealing does not apply in "overarching fashion, ... but rather ... limits one party's discretion where a contract gives the party that discretion"), *aff'd*, 890 F.2d 11 (7th Cir. 1989). Edison was not bound to renegotiate

the contract. Edison's objection to the Magistrate Judge's recommendation on the third claim of Count IV is sustained. Defendant Edison's motion for summary judgment is granted with respect to plaintiff's claims in Count IV of breach of the duty of good faith and fair dealing.

### CONCLUSION

For the reasons stated above, the findings of the Magistrate Judge's Report and Recommendation are accepted in part and rejected in part. The defendant's motion for summary judgment on Count I of Plaintiff's First Amended Verified Complaint is granted. Count I is dismissed with prejudice. Defendant's motion for summary judgment on Count II is denied as to the allegations of an agreement in restraint of trade between Edison and Trench–It and granted as to all other allegations of conspiracy in restraint of trade. The defendant's motion for summary judgment on Count IV is denied as to Plaintiff's breach of contract claim and granted as to Plaintiff's breach of the covenant of good faith and fair dealing claim.